UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                    CIVIL ACTION

VERSUS                                      NO: 12-920

BOLLINGER SHIPYARDS, INC., ET AL.           SECTION: R(5)


### ORDER AND REASONS

Before the Court is defendants'[1] motion to dismiss plaintiff United States' False Claims Act (FCA), common law fraud, negligent misrepresentation, and unjust enrichment claims.[2]  For the following reasons, defendants' motion is GRANTED, and plaintiff is granted leave to amend.


## I. Background

The United States brings claims against Bollinger in connection with its work on the United States Coast Guard's Deepwater program, which involved the replacement of the Coast Guard's fleet of water vessels, aircraft, and electronic systems. The Government's claims are based on the following allegations.

---

[1] The motion was filed jointly by defendants Bollinger Shipyards, Inc., Bollinger Shipyards Lockport, L.L.C., and Halter-Bollinger Joint Venture, L.L.C. (collectively "Bollinger").

[2] R. Doc. 27.

In Phase 1 of the Deepwater program, the Coast Guard considered proposals from three prospective lead contractors. The Coast Guard selected Integrated Coast Guard Systems (ICGS) to proceed as the lead systems integrator under Phase 2 of the project.  Part of the Deepwater program involved converting existing 110-foot patrol boats into 123-foot patrol boats. Bollinger, which had built the 110-foot fleet, was ultimately selected as the subcontractor to design and construct the new 123-foot patrol boats.

The government alleges that in September 2000, during Phase 1 of the project, the Coast Guard notified ICGS and Bollinger that it was concerned about the structural integrity of the hulls of the vessels to be modified, since the vessels were to be extended by thirteen feet.[3]  It said that no analysis had been performed to determine if the increased stress on the hull would produce unacceptable bending of the hull girder.[4]  On October 3, 2000, Bollinger submitted to the Coast Guard a calculation of midship section modulus, which measures the hull's resistance to bending and is one measure of a boat's longitudinal strength.[5] Bollinger told the Coast Guard that it calculated the section modulus to be 7,152 cubic inches, which compared favorably to the

---

[3] R. Doc. 1 at 4-5.

[4] *Id.*

[5] *Id.* at 5.

2

standard of 3,113 cubic inches contained in the American Bureau of Shipping (ABS) Guide for Building and Classing High Speed Craft.[6]   The government alleges that Bollinger's section modulus calculation overstated the longitudinal strength of the proposed 123-foot patrol boat design by using thicker hull plating in its calculation than existed in the vessels.[7]   The complaint alleges that this initial representation was "unreasonable."[8]   The government alleges that it relied on Bollinger's representation of sufficient hull strength in accepting Bollinger's design and awarding the Phase 2 contract to ICGS on June 25, 2002, about two years after it received Bollinger's section modulus calculation.

The contract between the Coast Guard and ICGS contained a Contract Data Requirements List (CDRL), which identified the information that ICGS and Bollinger were required to provide the Coast Guard concerning the contract deliverables.[9]   The United States alleges that one of the requirements was that Bollinger provide the Coast Guard with a Hull Load and Strength Analysis (HLSA) in order to verify that the modified vessels met the program and contract requirements.[10]   The Government never

---

[6] *Id.*

[7] *Id.* at 5-6.

[8] *Id.*

[9] *Id.* at 6-7.

[10] *Id.*

specifically alleges what the program and contract requirements were for the converted vessels.  In August 2002, the Coast Guard issued the first of four Delivery Task Orders (DTOs) to ICGS for Bollinger to commence the 110-foot patrol boat conversion project on a firm fixed-price basis.[11]  In May and August 2003, the Coast Guard issued three additional DTOs for converted patrol boats.[12]

The United States alleges that during Phase 1, Bollinger was notified by a NGSS predecessor that the ICGS contract required the contractor to use ABS to certify compliance with ABS standards.[13]  The government does not allege that ABS certification was in fact a written contract requirement or that the CDRL included ABS certification as a requirement for delivery.  The United States alleges that on August 26, 2002, Bollinger's chief executive officer, Boysie Bollinger, advised Bollinger personnel that an ABS executive who was a former Coast Guard Commandant had offered to review the hull design of the modified patrol boats confidentially.[14]  CEO Bollinger asked for the views of his staff as to whether or not to accept the offer.[15]  The United States alleges that Bollinger vice president

---

[11] *Id.* at 7.

[12] *Id.*

[13] *Id.* at 6.

[14] *Id.*

[15] *Id.*

T.R. Hamblin responded by recommending that Bollinger decline ABS' offer to conduct a review.  Then on August 27, 2002, CEO Bollinger allegedly replied to Hamblin:

> I'm concerned that [Kramek] sells CG on the fact that they need this review. . . . [ABS] would love the additional responsibility from the CG and as we both know, adverse results could cause the entire 123 to be an un-economical solution if we had to totally rebuild the hull. . . . MY CONCERN - we don't do anything - ABS gets CG to require it without our input, and the result is we BLOW the program.[16]

The United States alleges that on or about the same day an unidentified Bollinger employee or employees performed a series of calculations of the 123-foot patrol boat section modulus.[17] They allegedly ran the Midship Section Calculator (MSC) program at least three times, changing input data, and obtaining results of 2,836, 3,037, and 5,232 cubic inches.[18]  The United States alleges that Bollinger obtained the result of 5,232 cubic inches by changing the physical properties of the shape files included in the MSC model and by entering "data into the MSC program that did not reflect the actual structural characteristics of the converted vessels."[19]

------

[16] *Id.* at 7-8 (as quoted in the complaint)

[17] *Id.* at 8.

[18] *Id.*

[19] *Id.* at 8-9.

On August 28, 2002, NGSS authorized Bollinger to proceed with the work "in anticipation of definitizing a Firm Fixed Price - type contract by 30 September 2002."[20]  The complaint does not allege when the contract was actually "definitized."[21]  On September 4, 2002, Bollinger submitted to the Coast Guard an initial CDRL S012-11 report stating that the midship section modulus was 5,232 cubic inches.[22]  This calculation was significantly lower than the 7,152 cubic inches calculation that Bollinger submitted during Phase 1, but still above the minimum section modulus of 3,113 cubic inches contained in the ABS Guide.[23]  The complaint also alleges that Bollinger created an internal draft CDRL S012-11 report that showed a 3,037 cubic inches section modulus, but it did not submit this to the Coast Guard.

The United States alleges that on October 9, 2002, Bollinger held a Preliminary Design Review meeting at which Bollinger told the Coast Guard that ABS would review the midship section modulus calculation and longitudinal strength.[24]  The complaint alleges that on December 18, 2002, Bollinger informed the Coast Guard at

---

[20] *Id.* at 8.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 5-6.

[24] *Id.* at 9

a Critical Design Review Meeting that ABS had been engaged to review compliance with "ABS rules."[25]  The United States further alleges that ABS did not certify or review Bollinger's section modulus calculations.[26]  On December 16, 2002, Bollinger submitted a final CDRL S012-11 report with the same section modulus of 5,232 cubic inches as the September report.[27]  In March 2004, Bollinger delivered to the Coast Guard the first converted patrol boat, the Matagorda, which the Coast Guard paid for.[28]

The United States alleges that on August 20, 2004, after the delivery of the Matagorda, a Bollinger Vice President signed CDRL S016 certifying compliance with applicable contract requirements.[29]  On September 10, 2004, the Matagorda suffered a structural casualty.[30]  The United States alleges that the subsequent Coast Guard investigation found that Bollinger's reported measurements "overstated the actual section modulus depicting the longitudinal strength of the hull."[31]  Bollinger

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at 10.

[30] *Id.*

[31] *Id.*

7

retested the hull strengths of the boats and reported an actual section modulus of 2,615 cubic inches.[32]   The United States also alleges that on October 13, 2004, after the failure of the Matagorda, Bollinger vice president Hamblin emailed CEO Bollinger and others that, "we did lead the CG into a false sense of security by telling them early on that the Section Modulus for a 123 would be 5230 inches cubed as opposed to the real number, just above 2600."[33]   The complaint alleges that between November 22, 2002, and December 26, 2006, the Coast Guard paid approximately $78 million in response to 65 requests for payment from ICGS for work performed by Bollinger.[34]   The United States alleges that all of the vessels supplied by Bollinger turned out to be unseaworthy.[35]   The parties executed a statute of limitations tolling agreement on December 5, 2008.[36]

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 10-11.

[36] *Id.* at 11.  Before the government filed its complaint, it had access to substantial information from its investigation into the conduct of ICGS, Lockheed, NGSS, and Bollinger arising from the WPB conversion project. R. Doc. 51 at 3, n. 3.  Bollinger asserts that it made eleven document productions, totaling more than 40,000 documents, made eight of its employees available for interviews, and agreed to toll the statute of limitations for potential legal claims to give the Department of Justice more time to complete its investigation. *Id.*

On July 29, 2011, the United States filed this action against Bollinger based on allegations that "Bollinger knowingly misled the Coast Guard to enter into a contract for the lengthening of the Coast Guard cutters by falsifying data relating to the structural strength of the converted vessels."[37] The United States alleges five causes of action: that Bollinger (1) knowingly presented false or fraudulent claims for payment or approval to the United States in violation of the False Claims Act, 31 U.S.C.A. § 3729(a)(1)(A); (2) knowingly made false records or statements material to false or fraudulent claims for payment by the United States in violation of the False Claims Act, § 3729(a)(1)(B); (3) committed common law fraud by making misrepresentations of material fact; (4) made negligent misrepresentations; and (5) was unjustly enriched.  Bollinger has filed a motion to dismiss for failure to state a claim, and for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).  Bollinger also argues that the statute of limitations bars the United States' False Claims Act and negligent misrepresentation claims.

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is

---

[37] *Id.* at 1.

plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1960 (2009)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1940.  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Id.*  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly,* 550 U.S. at 555.  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 256.  If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief,

10

*Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n.9 (5th Cir. 2007), the claim must be dismissed.

## III. Discussion

*A.  False Claims Act*

In its complaint, the United States alleges violations of two different provisions of the FCA.  The first provision, 37 U.S.C. § 3729(a)(1)(A),[38] imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government.  The second provision, section 3729(a)(1)(B), imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  A violator of the FCA is liable to the United States for civil penalties and three times the amount of the government's damage. *Id.* § 3729(a)(1).

For the purposes of the statute, "knowing" and "knowingly" mean that a person either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 37 U.S.C. §

---

[38] The subsections of § 3729 were reorganized by statute in 2009 as part of the Fraud Enforcement and Recovery Act of 2009 (FERA).  See Pub.L. No. 111-21, 123 Stat. 1617, 1621-22 (2009). References will be to the current version of the statute.

11

3729(b)(1)(A).   The mental-state requirement of the FCA requires nothing more.   *Id.* § 3729(b)(1)(B).

Liability for a violation of sections 3729(a)(1)(A) and (B) of the FCA rests on "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."   *United States ex rel. Longhi v. Lithium Power Techs.*, 575 F.3d 458, 467 (5th Cir. 2009)(quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008))(quotation marks removed).

Under this framework, defendants argue that the complaint fails to meet the pleading standards required for FCA suits. Actions brought under the FCA must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).   *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).   Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake."   Fed. R. Civ. P. 9(b).   This standard supplements the pleading requirements of Federal Rule of Civil Procedure 8(a), and together the two rules necessitate that a plaintiff supply "simple, concise, and direct" allegations of the circumstances amounting to the fraud. *Grubbs*,

565 F.3d at 186.  These allegations "must make relief plausible, not merely conceivable, when taken as true."  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

In order to plead fraud with particularity, "a plaintiff must state the factual basis for the fraudulent claim with particularity and cannot rely on speculation or conclusional allegations."  *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008).  In general, such a statement should include the "time, place, and contents of the false representation, as well as the identity of the person making the misrepresentation and what that person obtained thereby."  *Grubbs*, 565 F.3d at 186 (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Group.*, 193 F.3d 304, 308 (5th Cir. 1999)); see also *Thompson*, 125 F.3d at 903.

In certain circumstances, the pleading requirements of Rule 9(b) may be slightly relaxed and the plaintiff may plead on information and belief, in particular when facts about the fraud are "peculiarly within the perpetrator's knowledge."  *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003)(quoting *Russell*, 193 F.3d at 308); *see also United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 454 (5th Cir. 2005).  Such relaxation, however, "must not be

13

mistaken for license to base claims of fraud on speculation and conclusory allegations." *Thompson*, 125 F.3d at 903 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

1. The United States' Fraud in the Inducement of the Contract Theory

In the complaint, the United States alleges that Bollinger fraudulently induced the Coast Guard to enter into the Phase 2 contract for the lengthening of the patrol boats by "falsifying data related to the structural strength of the converted vessels."[39]  This theory cannot survive defendant's motion to dismiss because the government fails to allege that Bollinger engaged in any fraudulent conduct before the Coast Guard awarded the Phase 2 contract on June 25, 2002, or authorized Bollinger to proceed with the work on the conversion project in August 2002. The United States alleges that in Phase 1 the Coast Guard raised concerns about the structural integrity of the converted vessels if they were extended thirteen feet as the project envisioned. The Government alleges that in October 2000, Bollinger submitted a longitudinal strength analysis showing that the redesigned boats would have a sufficient section modulus (7,152 cubic inches), well above the 3,113 cubic inches in the ABS Guide.  The

---

[39] *Id.* at 1.

14

government further alleges that it relied on Bollinger's hull strength representation in accepting its design and awarding the Phase 2 contract to ICGS two years later on June 25, 2002.[40]

The complaint does not allege facts indicating that Bollinger's initial representation of the hull strength was knowingly false or made in deliberate ignorance or disregard for the truth.  Instead, the government alleges:

> Bollinger submitted to the Coast Guard a longitudinal strength analysis stating that 'the required section modulus is 3113 inches cubed and the actual section modulus of the patrol boat is 7152 inches cubed.'  This statement indicated to the Coast Guard that Bollinger's design for the 123-Ft WPB's included a safety factor of 2.3 times the ABS required section modulus.  Bollinger obtained the section modulus values reported to the Coast Guard in Phase 1 by using thicker hull plating in its design calculation than existed in the 110-Ft WPBs at the time.  Bollinger did not tell the Coast Guard that it had used thicker hull plating in its calculations.  Since there was no provision in the proposal for replacing the hull plating on the 110-Ft WPBs with thicker hull plating during the conversion, using this thicker hull plating in the calculations was *not reasonable*.[41]

Thus, the complaint does not even allege that Bollinger made an intentionally false or recklessly untrue statement, or acted with deliberate indifference.  Indeed, an unreasonable calculation is not the equivalent of a fraudulent statement as unreasonableness is consistent with negligence.  Moreover, the complaint alleges

---

[40] *Id.* at 3-6.

[41] *Id.* at 5-6 (emphasis added).

15

that Bollinger's 7,152 cubic inches statement to the Coast Guard
was consistent with an internal statement made by Bollinger's
chief naval architect, not that Bollinger knew one thing
internally but said something different to the Coast Guard.[42]
Because the United States does not allege any fraudulent
representations predating the award of the contract, it fails to
state a claim based on the theory of fraud presented in the
complaint - fraudulent inducement of the Phase 2 contract.  The
government's fraud in the inducement theory also misses the mark
because the government acknowledges that it knew that the vessels
would not be constructed with a section modulus of 7,152 cubic
inches.  It alleges later in the complaint that Bollinger told
the Coast Guard that the vessels would have a section modulus of
5,232 cubic inches and it accepted that number.  Indeed, it never
even alleges that a section modulus of 7,152 cubic inches was a
contract specification that had to be met.  For these reasons,
its fraudulent inducement of the contract theory fails.


2.  Fraudulent Inducement of Acceptance of Delivery

     In light of the difficulties posed by the government's fraud
in the inducement of the contract theory, the United States
wisely abandoned it in responding to Bollinger's motion to
dismiss.  The United States argues instead that Bollinger made

---

[42] *Id.*

other overstatements of the section modulus after the award of the contract, which fraudulently induced the Coast Guard to accept delivery of the vessels and to pay for them.  The United States relies on the following false statements identified in its complaint:  Bollinger's September 4, 2002, initial CDRL S012-11 report and December 16, 2002, final CDRL S012-11 report, which allegedly overstated the hull strength of the 123-foot vessel; Bollinger's August 20, 2004, confirmation that it had complied with applicable Phase 2 contract requirements; and Bollinger's October 9, 2002, and April 20, 2004 assurances that it had engaged ABS to independently review the 123-foot design. Because the United States has not alleged with particularity, pursuant to Rule 9(b), that Bollinger made false statements with the proper scienter and that the statements were material to the government's paying claims, its alternative theory of FCA liability cannot survive defendant's motion to dismiss.


a. *The United States fails to plead the requisite scienter and a plausible theory of materiality as required for both FCA claims.*

     The government fails to plead sufficient facts to meet the scienter and materiality requirements shared by both section 3729(a)(1)(A) and section 3729(a)(1)(B).  *Longhi*, 575 F.3d at 467.  Regarding scienter, both FCA provisions require that the acts be taken "knowingly," which in turn means that a person either "has actual knowledge of the information," "acts in

17

deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* §§ 3729(a)(1), 3729(b).

The United States does not allege that Bollinger's contract required a specific section modulus, and it is vague on exactly what Bollinger's contract specified as design requirements.  The United States alleges that Bollinger ran a series of calculations in 2002 on the section modulus and submitted only the largest calculation, which was obtained by changing the physical properties of the shape files included in the MSC model.  It alleges that "Bollinger entered data into the MSC program that did not reflect the actual structural characteristics of the converted vessels."[43]  It is unclear what this means or how the conduct is fraudulent.  The complaint does not say which physical properties were changed or how the changes affected the vessel as constructed.  Nor does it allege that Bollinger knowingly, or with reckless disregard or deliberate ignorance of the truth, submitted a false calculation with the intention of building something of lesser strength.  The complaint does not even allege that the lower 2002 calculations which went unreported were the correct ones.  In fact, the complaint indicates that all three of the 2002 calculations were inaccurate.  None of the three alleged calculations of 2,836, 3,037, and 5,232 cubic inches performed in

_____

[43] R. Doc. 1 at 8-9.

2002 matched the "true section modulus" of 2,615 cubic inches, which Bollinger calculated following the casualty of the Matagorda.[44]  The 2002 calculations, including the 5,232 cubic inches reported to the Coast Guard, were also all significantly lower than Bollinger's Phase 1 calculation of 7,152 cubic inches. Thus the complaint reflects that the Coast Guard was aware that the section modulus calculations were susceptible to change because Bollinger had submitted a section modulus calculation of 7,152 cubic inches in 2000, which was 35% higher than the 5,232 calculation it submitted later.  The Coast Guard decided to proceed with the program with a difference of almost 2,000 cubic inches for reasons that go unexplained in the complaint.  That Bollinger ran three incorrect calculations and submitted the highest one does not indicate that Bollinger acted with the requisite scienter.

The complaint also identifies emails sent before and after Bollinger submitted the inaccurate measurements, which indicate that senior Bollinger personnel were worried about the Coast Guard getting an independent ABS review of the hull design and were aware after the fact that the section modulus reported by Bollinger had misled the Coast Guard.  However, the allegations are an insufficient factual predicate for the conclusion that Bollinger was acting knowingly or with reckless disregard or

---

[44] *Id.* at 8-10.

deliberate ignorance of the truth when it reported a section modulus of 5,232 cubic inches.  Boysie Bollinger's email expressing concern that if Bollinger did not do anything, ABS review, "without [Bollinger's] input," could "BLOW the program,"[45] is facially neutral on the issue.  It can be read as indicating that Boysie Bollinger wanted Bollinger to be involved in any ABS review in order to answer questions and provide information or insights that could avoid misconceptions that might occur without its input.  Plaintiff does not allege, and the excerpted portion of the email does not indicate, that Boysie Bollinger knew of any false hull strength calculations, intended for the company to conduct false calculations in the future, or instructed anyone to do so.  Nor does it indicate an intention to provide false "input."

Bollinger vice president T.R. Hamblin's email also lacks the necessary context to indicate the requisite scienter.  He wrote that, "we did lead the CG into a false sense of security by telling them early on that the Section Modulus for a 123 would be 5230 inches cubed as opposed to the real number, just above 2600."[46]  This statement was made on October 12, 2004, after the Matagorda failed, after Bollinger had recalculated the section modulus,  and after everyone was aware that the 2002 calculation

---

[45] *Id.* at 7-8.

[46] *Id.* at 10.

was incorrect.[47]  Thus, while Hamblin is clearly admitting a
mistake, neither the quoted text nor other allegations in the
complaint support the inference that Bollinger deliberately led
the Coast Guard into a false sense of security knowingly or with
reckless disregard or deliberate ignorance of the truth at the
time the statements were made.  Indeed, Bollinger never
calculated a section modulus "just above 2600" before it
submitted CDRL S012-11 - its lowest calculation at that time was
2,836 cubic inches.

    With regard to the remaining allegations, the complaint
fails to articulate a plausible theory of materiality.  To meet
the materiality requirement of section 3729(a)(1)(A), "the false
or fraudulent statements [must] have the potential to influence
the government's decisions." *Longhi*, 575 F.3d at 470.  Section
3729(a)(1)(B) requires that a defendant "knowingly makes, uses,
or causes to be made or used, a false record or statement
material to a false or fraudulent claim."  The statute defines
"material" as "having a natural tendency to influence, or be
capable of influencing, the payment or receipt of money or
property." 31 U.S.C. § 3729(b)(4).

    The Complaint fails to allege that Bollinger's October 8,
2002, and December 18, 2002, oral statements that Bollinger would
engage ABS to review the section modulus and that ABS had been

---

[47] *Id.*

21

engaged to review compliance with "ABS rules" were material to Bollinger's claims for payment.  Although the United States alleges that ABS review of Bollinger's section modulus calculations never took place, it provides no indicia that Bollinger intended for the assurances to cause the government to pay false claims.  Further, the complaint alleges that the Coast Guard accepted the Matagorda in March 2004 without certification that ABS had conducted any review.  Indeed, the government points to no contract provision requiring ABS certification; nor does it even allege that ABS certification was included on the CDRL as a requirement for delivery of the converted vessels.  Thus, Bollinger's earlier statements were not material because the Coast Guard was willing to accept delivery of and pay for the converted vessels without requiring a certification from ABS or contemporaneous evidence that ABS had in fact conducted a review. The complaint contains no allegations that link Bollinger's statements regarding ABS review to the Coast Guard's decisions to accept delivery of the vessels and to pay for them.

Bollinger's August 20, 2004, certification of compliance with applicable contract requirements was also immaterial because the Coast Guard had already accepted the Matagorda in March 2004. Further, the complaint never specifically alleges which contractual requirements were not satisfied or that the unnamed

Bollinger VP who signed the certification knew that they were not satisfied.

Further weakening the plausibility of the United State's theory of materiality is the complaint's allegation that the Coast Guard continued to accept delivery of and pay for vessels after it became aware in October 2004 that the section modulus was not what it was represented to be, that it was 50% less, and that the Matagorda had suffered a casualty and was unseaworthy. The government is subject to the "government knowledge" defense which forecloses FCA liability when the government pays claims with knowledge of the falsity of the claims.  In *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003), for example, the Fifth Circuit held that certifications of a property's habitability made on forms submitted to receive government housing subsidies were not "false claims" because the government was aware that the apartments had habitability problems and agreed to work with owners to bring the property back into compliance.  The *Southland* court held that "[i]f the government knows and approves the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *Id.* at 682.  The court in *U.S. ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007), aff'd sub nom. U.S. ex rel. Gudur v. Deloitte & Touche, 07-20414, 2008

WL 3244000 (5th Cir. Aug. 7, 2008), describes the rationale for
the "government knowledge defense":

> The government's knowledge of the alleged false claim
> is relevant to whether the defendant "knowingly"
> submitted a false claim. The inaptly-named "government
> knowledge defense" captures the understanding that the
> FCA reaches only the "knowing presentation of what is
> known to be false." *Id.* at 682 (citing *Hagood*, 81 F.3d
> at 1478). This defense suggests that the "knowing"
> submission of false or fraudulent claims is logically
> impossible when responsible government officials have
> been fully apprized of all relevant information. *Id.*
> Since the crux of an FCA violation is intentionally
> deceiving the government, no violation exists where
> relevant government officials are informed of the
> alleged falsity, thus precluding a determination that
> the government has been deceived. *Id. See also United
> States ex rel. Butler v. Hughes Helicopters, Inc.*, 71
> F.3d 321, 327 (9th Cir.1995); *Wang*, 975 F.2d at 1421.

*Gudur*, 512 F. Supp. 2d at 932.

 The United States argues that the 2002 false statements
continued to taint claims for payment following discovery of
their falsity through December 2006 because the Coast Guard had
sunk costs in the program such that it had to continue accepting
the flawed vessels in the hope of repairing them.  The Court has
found no law supporting this sunk costs theory.  Therefore, FCA
liability is foreclosed for all claims for payment made after the
government knew that the section modulus was incorrect.

For all of the foregoing reasons, the United States fails to
plead claims under 31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B)

with sufficient particularity or plausibility.  Its FCA claims must therefore be dismissed.

*B. Common Law Fraud Claim*

The United States also makes a claim that defendants' actions constituted common law fraud.  As with the FCA claims, a common law fraud claim is subject to the heightened pleading requirements of Rule 9(b).  The United States asserts that its common law fraud claim is governed by federal law.[48]  Bollinger asserts that Louisiana law applies.[49]  The Court determines that the elements of fraud are essentially the same under both federal and Louisiana law.  Louisiana courts have broken the statutory fraud standard into the following elements: "1. a misrepresentation of material fact; 2. made with the intent to deceive; 3. reasonable or justifiable reliance by the plaintiff; and 4. resulting injury." *Wooley v. Lucksinger*, 14 So.3d 311, 378-79 (La. App. 1st Cir. 2008)(citing La. Civ. Code Ann. art. 1953).  The elements of fraud under federal common law are "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." *Pence v. United States*, 316 U.S. 332, 338 (1942)(identifying the

---

[48] R. Doc. 49 at 18-19.

[49] R. Doc. 27-1 at 20.

25

elements of fraud established by prior Supreme Court cases); *See also United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 52 (D.D.C. 2011)(applying the same standard when government brought common law fraud claim in addition to FCA claims against government contractor).

Under both Louisiana and Federal common law, the fraud standard is similar to the standard for FCA claims under 37 U.S.C. §§ 3729(a)(1)(A)-(B).  To make out either claim, a plaintiff must show that the defendant made a material false representation with scienter and that the plaintiff relied on it. The scienter requirement of fraud, which calls for a plaintiff to show defendant's specific intent to deceive, is stricter than the "knowing" element of FCA claims.  *See Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 442 (5th Cir. 2011).  The United States bases its fraud claim on the same allegations relied upon for its FCA claims.  As explained, *supra*, those allegations, taken as true, fail to establish that Bollinger knowingly deceived and defrauded the Coast Guard.  Thus, plaintiff's allegations also fail to satisfy the higher standard of specific intent, and its fraud claim must be dismissed.


*C. Negligent Misrepresentation Claim*

The United States further alleges that Bollinger engaged in negligent misrepresentation by reporting the false hull

26

strengths.  In its response memorandum, the United States cites
*Brown v. Forest Oil Corp.,* 29 F.3d 966, 969 (5th Cir. 1994),
which describes the elements of negligent misrepresentation under
Louisiana law.[50]  In Louisiana, "[a] person commits the tort of
negligent misrepresentation when (1) he has a legal duty to
supply correct information; (2) he breaches that duty; and (3)
his breach causes damages to the plaintiff."  *Soc. of the Roman
Catholic Church of the Diocese of Lafayette, Inc. v. Interstate
Fire & Cas. Co.,* 126 F.3d 727, 742 (5th Cir. 1997)(citing
L.S.A.-C.C. arts. 2315 & 2216); *Brown*, 29 F.3d at 969.  This tort
can be committed by nondisclosure or misinformation.  *Soc. of the
Roman Catholic Church*, 126 F.3d at 742.  Federal Rule of
Procedure 8(a), without the stricter Rule 9(b) standard for
pleading fraud, applies to pleading negligent misrepresentation
claims.  *See Cargill, Inc. v. Degesch America, Inc.*, No. 11-2036,
2012 WL 2367392 at 4 (E.D. La. 2012).  What matters, then, is
whether plaintiff has pleaded a plausible negligent
misrepresentation claim.  *See Id.; see also Iqbal*, 556 U.S. at
678-79; *Twombly*, 550 U.S. at 570.

Here, the complaint alleges that the Phase 2 contract
required Bollinger to provide the Coast Guard with a Hull Load
and Strength Analysis, in order to verify that the modified

---

[50] R. Doc. 49 at 20.

patrol boats met program and contract requirements.[51]  Bollinger submitted preliminary and final HLSA reports (CDRL S012-11), which allegedly misrepresented the section modulus of the retooled vessels.[52]  The complaint includes allegations that the Coast Guard acted in reliance on the incorrect information by accepting delivery and making payments, and that it suffered damages as a result.  At least regarding payments made before the Coast Guard learned of the true section modulus, the United States' factual allegations identify the elements of duty, breach, and damages necessary for a plausible negligent misrepresentation claim.

Nevertheless, the United States' negligent misrepresentation claim must be dismissed because facts in the complaint indicate that it is time barred.  "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like."  *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal  Practice & Procedure, § 1357 at 714-21 (3d ed. 2004)("[T]he inclusion of dates in the complaint indicating that the action is untimely renders it subject to dismissal for failure to state a claim.")).

---

[51] R. Doc. 1 at 6-7.

[52] *Id.* at 8-9.

Pursuant to 28 U.S.C. § 2415(b), any action for money damages "brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues."  However, 28 U.S.C. § 2416(c) provides that "all periods during which...facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances," must be excluded when calculating the statute of limitations periods set forth in § 2415.  Facts indicating the presence of all elements of the right of action "are, in the language of section 2416(c), the 'facts material to the right of action.'"  *U.S. ex rel. Wilkins v. N. Am. Const. Corp.*, CIV.A. H-95-5614, 2001 WL 34109383 (S.D. Tex. Sept. 26, 2001).  Thus, the statute of limitations was tolled until the proper government official knew, or reasonably should have known, the facts constituting the elements of a negligent misrepresentation claim, namely that Bollinger breached a legal duty to supply correct information and thereby caused damages to the Coast Guard.

There is no Fifth Circuit case law addressing the question of who qualifies as the "government official charged with the responsibility to act in the circumstances," in a similar case. 28 U.S.C. § 2416(c).  The legislative history for § 2416(c) indicates:

> This provision is required because of the difficulties
> of Government operations due to the size and complexity
> of the Government. It is not intended that the
> application of this exclusion will require the
> knowledge of the highest level of the Government.
> Responsibility in such matters may extend down into
> lower managerial levels within an agency. As a general
> proposition, the responsible official would be the
> official who is also responsible for the activity out
> of which the action arose. Such an official is the one
> likely to know whether the material fact does involve
> the possibility of a cause of action which may be
> asserted against the Government.

S. Rep. No. 1328 (1966), reprinted in 1966 U.S.C.C.A.N. 2502, 2507; *see also United States v. Stella Perez*, 956 F.Supp. 1046, 1052 (D.P.R.1997)(noting that under 28 U.S.C. § 2416(c), "it is crucial that facts be known to a government official who is charged with sufficient responsibility to take action under the circumstances"); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F.Supp. 195, 205 (N.D.N.Y.1991) *aff'd sub nom. U.S. ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2d Cir. 1993)(noting that under 28 U.S.C. § 2416(c), when official who could take action recognizes the essential elements of the cause of action, the statute of limitations is not tolled), *aff'd* 985 F.2d 1148 (2nd Cir. 1993); *U.S. ex rel. Zissler v. Regents of the Univ. of Minnesota*, 992 F. Supp. 1097, 1106 (D. Minn. 1998)(denying motion to dismiss when reasonable fact finder could conclude that limitations period was tolled because official who could take

action did not know and reasonably could not have known elements of the cause of action).

Defendants argue that the United States' negligent misrepresentation claim is barred on its face by 28 U.S.C. § 2415(b) because the Coast Guard had knowledge of the injury allegedly caused by Bollinger's representations no later than October 2004, more than three years before the tolling agreement was executed on December 5, 2008.  The United States argues that the official of the United States charged with the responsibility to act under § 2416(c) is an official within the Department of Justice.  It argues that the October 2004 date when the Coast Guard learned of the falsity of the HLSA reports is irrelevant because the Department of Justice did not learn until September 2008 that Bollinger possessed lower section modulus calculations at the time it prepared its reports with the incorrect 5,232 cubic inches calculation.[53]  It argues it was at this time, that, by way of document production during the government's investigation, the Department of Justice learned Bollinger had breached its duty to exercise reasonable care.  Before this discovery, the United States says, the official charged with responsibility to act had no reason to believe that the false section modulus report was anything other than an innocent and reasonable mistake.

---

[53] R. Doc. 49 at 24.

The United States relies on *Martin J. Simko Const., Inc. v. United States*, 852 F.2d 540, 548 (Fed. Cir. 1988), in which the Federal Circuit held that the Department of Justice is responsible for investigating and bringing False Claims Act claims.  852 F.2d at 548. *But see Kreindler*, 777 F. Supp. at 205 (Department of Defense contracting officer was one, but not the only, official with the responsibility to act on False Claims Act claims stemming from helicopter manufacturer's contract with the Army).  Even if the Court were to accept *Simko*'s conclusion that the Department of Justice is exclusively responsible for administering False Claims Act actions, it does not follow that the Department of Justice is solely responsible for every claim brought by the government, including the negligent misrepresentation claim in this case.  For purposes of § 2416(c) tolling, different officials within the government are responsible for bringing different types of claims.  *See, e.g., Fed. Deposit Ins. Corp. v. Martinez Almodovar*, 671 F. Supp. 851, 855 (D.P.R. 1987)(the Federal Deposit Insurance Corporation (FDIC) was government official charged with the responsibility to bring actions seeking to collect assets acquired from the receiver of a closed bank); *Fed. Deposit Ins. Corp. v. Paul*, 735 F. Supp. 375 (D. Utah 1990)(official at FDIC was responsible to bring negligence, breach of fiduciary duties, and breach of contract actions against former officers and directors of failed

bank); *United States v. Gov't Dev. Bank*, 725 F. Supp. 96, 100
(D.P.R. 1989)(government officials at the Federal Reserve Bank of
New York or the Food Nutrition Service were the officials
responsible for bringing contract claims against administrator of
the Food Stamp Program in Puerto Rico); *United States v. Boeing
Co., Inc.*, 845 F.2d 476, 482 (4th Cir. 1988) *rev'd sub nom*.
*Crandon v. United States*, 494 U.S. 152, (1990)(Department of
Defense contracting officer for Boeing and employees of Defense
Contract Audit Agency charged with auditing responsibilities had
the responsibility to act to recover severance payments from
Boeing and former employees appointed to government posts under
18 U.S.C. § 209(a), a conflict of interest statute).

The United States also cites to *Jankowitz v. U. S.*, 533 F.2d
538, 548 (Ct. Cl. 1976), in which the government brought a common
law claim for repayment of bribes and other illegal payments
received by a government official.  The Court of Claims refused
to dismiss the claim based on the statute of limitations when the
government presented an uncontroverted affidavit that the United
States Attorney had not received actual knowledge of facts
indicating fraud before the relevant date, March 23, 1970. *Id.*
However, although the *Jankowitz* court identified the Department
of Justice as one responsible official charged with investigation
of possible illegal payments, it did not rule out the existence
of others.  *Id.*  Nothing in the opinion indicates that *any*

government official had notice of the underlying facts of the
claim before March 23, 1970.  *Id.*  Further, the court in
*Jankowitz* did not deal with a negligent misrepresentation claim
and did not answer the question of whether the statute of
limitations on such a claim is always tolled until someone in the
Department of Justice has notice of the facts. 533 F.2d at 548.

　　Neither the cases cited by plaintiff nor any found by the
Court indicates that the responsible officials charged with
acting on a negligent misrepresentation claim are exclusively
within the Department of Justice.  The Court turns then to the
general proposition that the responsible official is the official
who is also responsible for the activity out of which the action
arose.  S. Rep. No. 1328.  Like the contracting officer in
*Kreindler*, the official charged with responsibility to take
action on this claim is the official or officials at the Coast
Guard who were responsible for the Deepwater Program and the
Coast Guard's contract with ICGS and relationship with Bollinger.
It is those people who were responsible for the underlying Phase
2 agreement and who were familiar with Bollinger's duty to supply
correct information out of which the cause of action arose.
Tellingly, the Coast Guard had the authority to conduct an
investigation into the failure, and it in fact did so in October
2004.[54]

---

[54] R. Doc. 1 at 10.

34

The Coast Guard has had actual or constructive notice of all elements of the negligent misrepresentation claim since October 2004, at the latest.  At that time, after the Coast Guard learned that Bollinger had submitted erroneous measurements, the Coast Guard became aware that Bollinger breached its duty to supply correct information and had notice that Bollinger's breach caused damages to the Coast Guard.  The government argues that prescription was tolled until the responsible official learned that Bollinger possessed two lower calculations when it reported the 5,232 cubic inches section modulus.  This argument is incorrect because the knowledge necessary to trigger prescription on the negligent misrepresentation claim is merely knowledge that the information provided by the defendant was false.  *Nat'l Council on Comp. Ins. v. Quixx Temp. Services, Inc.*, 95-0725 (La. App. 4 Cir. 11/16/95), 665 So. 2d 120, 124.  It is irrelevant to the claim whether the misrepresentation was a negligent error or an intentional misstatement, which the government has unsuccessfully argued is shown by the existence of lower internal measurements.  All that is required to "excite attention and prompt further inquiry" into the claim is knowledge that the information was wrong and that the government suffered damages. *Id.*  Moreover, the Coast Guard already knew long before October 2004 that Bollinger had submitted a section modulus of 7,152 cubic inches in 2000, which was based on Bollinger's

35

"unreasonable" use of thicker hull plating.  Knowing that Bollinger submitted the wrong section modulus a second time clearly put the Coast Guard on notice of its negligent misrepresentation claim.  Because the official responsible for acting had actual or constructive knowledge of the negligent misrepresentation claim more than three years before Bollinger and the United States entered the tolling agreement on December 5, 2008, this claim must be dismissed.

## D. Unjust Enrichment Claim

Finally, the United States alleges that Bollinger has been unjustly enriched at the expense of the United States and, in the absence of another remedy, should be required to pay restitution. Defendants urge this Court to dismiss plaintiff's alternative claim of unjust enrichment because the United States has not established the requisite elements of unjust enrichment under Louisiana law.  In Louisiana, there are five elements of an unjust enrichment claim: (1) enrichment of the defendant; (2) an impoverishment of the plaintiff; (3) a connection between the enrichment and the resulting impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) there must be no other remedy at law available to the plaintiff.  La. Civ. Code Ann. art. 2298; *Baker v. Maclay Properties Co.*, 648 So.2d 888, 897 (La. 1995).  Under Louisiana

36

law, an unjust enrichment claim cannot survive when, as here, there is an express contract between the parties and other remedies at law are available.  *See Bamburg Steel Buildings, Inc. v. Lawrence General Corp.*, 817 So.2d 427, 438 (La. Ct. App. 2002)(explaining that the existence of a contract makes unavailable an unjust enrichment claim); *Fagot v. Parsons*, 958 So.2d 750, 753 (La. Ct. App. 2007)(dismissing plaintiff's unjust enrichment claim because there were "two other remedies" that plaintiff could have asserted against defendant); *Westbrook v. Pike Elec., L.L.C.*, 799 F. Supp. 2d 665, 672 (E.D. La. 2011)(plaintiff failed to state a claim for unjust enrichment under Louisiana law where there were alternative remedies available, including for breach of contract).

The United States asserts that its unjust enrichment claim is governed by federal law, not state law.[55]  Nevertheless, it fails to allege a standard of unjust enrichment under federal common law, or that the federal standard differs from the Louisiana standard.  Instead, it quotes the Louisiana standard presented in Bollinger's motion to dismiss, and argues that it has alleged the first four elements and that the fifth element - lack of another remedy - is preempted by the liberal pleading standard applicable to federal courts under Federal Rule of Civil

---

[55] R. Doc. 49 at 18-19.

Procedure 8(d)(2).[56] As the government argues, "at the motion-to-dismiss stage, courts ... have permitted the government to proceed with claims alleging FCA violations as well as claims for unjust enrichment or payment by mistake." *United States ex rel. Purcell v. MWI Corp.*, 254 F.Supp.2d 69, 79 (D.D.C. 2003). However, federal courts have maintained that there can be no claim for unjust enrichment when an express contract exists between the parties. *See, e.g., United States v. United Techs. Corp.*, 51 F.Supp.2d 167, 200 (D.Conn. 1999)("The ... amended complaint state[s] common law, quasi-contractual claims of unjust enrichment and payment by mistake[.] Because these two common law claims are quasi-contractual, they are inappropriate claims where, as here, there is an express contract."); *United States v. EER Sys. Corp.*, 950 F.Supp. 130, 133 (D.Md. 1996)("Because the above common law counts are quasi-contractual[,] ... they are inappropriate claims when there is an express contract."); *United States v. Hydroaire, Inc.*, No. 94 C 4414, 1995 WL 86733, at *6 (N.D.Ill. 1995)("While it is true that a plaintiff can plead in the alternative, as the Government suggests, the doctrine of unjust enrichment has no application where, as in this case, a specific contract governs the relationship of the parties."). Because the United States fails to cite, and the Court finds no case in which Louisiana courts or Fifth Circuit federal courts

---

[56] *Id.* at 22.

have permitted unjust enrichment claims despite the existence of
an express contract, the Court need not decide whether the claim
is governed by Louisiana law or federal common law.  In either
case, the Court must dismiss the unjust enrichment claim.


*E. Leave to Amend*

     While the Court dismisses the United States' complaint in
its entirety, the Court grants leave to amend its FCA and common
law fraud claims.  *See* Fed.R.Civ.P. Rule 15(a)(2) ("The court
should freely give leave when justice so requires."); *Jamieson By
and Through Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir.
1985)(noting a liberal federal policy regarding amendment of
pleadings, and listing undue delay, bad faith, dilatory motive,
repeated failure to cure deficiencies, undue prejudice to the
opposing party, and the futility of amendment as acceptable
justifications for denying leave). The United States may well
have False Claims Act or fraud claims to plead against Bollinger.
But given the federal pleading standards under Rule 9(b), *Twombly*
and *Iqbal*, the government's factual allegations in the context of
the history of the parties' dealings and the technical nature of
the government contract, do not add up to a plausible theory of
fraud.  After a Coast Guard investigation and a tolling
agreement, the government still has not said what was false about
Bollinger's section modulus calculations so that an inference can

39

be drawn that whoever made them had to know they were untrue. The government has already abandoned one theory of fraud.  It is time for it to plead with particularity what the fraud is.


## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss is GRANTED.  Plaintiff's negligent misrepresentation and unjust enrichment claims are dismissed with prejudice, and the United States is granted leave to amend its False Claims Act and fraud claims within 20 days of the entry of this Order.


New Orleans, Louisiana, this __30th__ day of January, 2013.


_____

**SARAH S. VANCE**
**UNITED STATES DISTRICT JUDGE**

40