UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                        CIVIL ACTION

VERSUS                                          NO: 12-920

BOLLINGER SHIPYARDS, INC., ET AL.               SECTION: R(5)

**<u>ORDER AND REASONS</u>**

Before the Court is the government's motion for
reconsideration of this Court's order of January 30, 2013.[1] For
the following reasons, the Court DENIES the United States'
motion.

**I. Background**

*A. Procedural History*

The United States brought claims against Bollinger in
connection with its work on the United States Coast Guard's
Deepwater program, which involved the replacement of the Coast
Guard's fleet of water vessels, aircraft, and electronic systems.
On July 29, 2011, the United States filed its original complaint
against Bollinger based on allegations that "Bollinger knowingly
misled the Coast Guard to enter into a contract for the
lengthening of the Coast Guard cutters by falsifying data

---

[1] R. Doc. 73.

relating to the structural strength of the converted vessels."[2]
The complaint alleged five causes of action: that Bollinger (1)
knowingly presented false or fraudulent claims for payment or
approval to the United States in violation of the False Claims
Act, 31 U.S.C.A. § 3729(a)(1)(A); (2) knowingly made false
records or statements material to false or fraudulent claims for
payment by the United States in violation of the False Claims
Act, § 3729(a)(1)(B); (3) committed common law fraud by making
misrepresentations of material fact; (4) made negligent
misrepresentations; and (5) was unjustly enriched. Bollinger
filed a motion to dismiss, which the Court granted.[3] The Court
dismissed all of the claims but granted the United States leave
to amend its False Claims Act and fraud claims.[4]

The United States then filed its First Amended Complaint and
a motion for reconsideration of certain rulings in the Court's
order dismissing the original complaint.[5] Specifically, the
United States seeks reconsideration of the Court's dismissal of
the unjust enrichment claim and the Court's ruling that to the
extent the United States could successfully re-plead causes of
action under the False Claims Act, any damages would be limited

---

[2] *Id.* at 1.

[3] R. Doc. 71.

[4] *Id.* at 40.

[5] R. Docs. 74, 73.

to the period of time before the Coast Guard had knowledge of the problems with the converted patrol boats.

*B. Factual Allegations in the Original Complaint*

The complaint alleged that the Coast Guard selected Integrated Coast Guard Systems (ICGS) to proceed as the lead contractor, with Bollinger, which had built the 110-foot fleet, selected as the subcontractor to design and construct the new 123-foot patrol boats.[6] The government alleged that in September 2000, during Phase 1 of the project, the Coast Guard notified ICGS and Bollinger that it was concerned about the structural integrity of the hulls of the vessels to be modified, since the vessels were to be extended by thirteen feet.[7] It said that no analysis had been performed to determine if the increased stress on the hull would produce unacceptable bending of the hull girder.[8] On October 3, 2000, Bollinger submitted to the Coast Guard a calculation of midship section modulus, which measures the hull's resistance to bending and is one measure of a boat's longitudinal strength.[9] Bollinger told the Coast Guard that it calculated the section modulus to be 7,152 cubic inches, which

---

[6] R. Doc. 1 at 4.

[7] R. Doc. 1 at 4-5.

[8] *Id.*

[9] *Id.* at 5.

3

compared favorably to the standard of 3,113 cubic inches contained in the American Bureau of Shipping (ABS) Guide for Building and Classing High Speed Craft.[10] The complaint alleged that Bollinger's section modulus calculation overstated the longitudinal strength of the proposed 123-foot patrol boat design by using thicker hull plating in its calculation than existed in the vessels.[11] The complaint alleged that this initial representation was "unreasonable."[12] The government alleged that it relied on Bollinger's representation of sufficient hull strength in accepting Bollinger's design and awarding the Phase 2 contract to ICGS on June 25, 2002, about two years after it received Bollinger's section modulus calculation.

The contract between the Coast Guard and ICGS contained a Contract Data Requirements List (CDRL), which identified the information that ICGS and Bollinger were required to provide the Coast Guard concerning the contract deliverables.[13] In the original complaint, the United States alleged that one of the requirements was that Bollinger provide the Coast Guard with a Hull Load and Strength Analysis (HLSA) in order to verify that

---

[10] *Id.*

[11] *Id.* at 5-6.

[12] *Id.*

[13] *Id.* at 6-7.

the modified vessels met the program and contract requirements.[14] The Government never specifically alleged what the program and contract requirements were for the converted vessels. In August 2002, the Coast Guard issued the first of four Delivery Task Orders (DTOs) to ICGS for Bollinger to commence the 110-foot patrol boat conversion project on a firm fixed-price basis.[15] In May and August 2003, the Coast Guard issued three additional DTOs for converted patrol boats.[16]

The United States alleged that during Phase 1, Bollinger was notified by a NGSS predecessor that the ICGS contract required the contractor to use ABS to certify compliance with ABS standards.[17] The complaint did not allege that ABS certification was in fact a written contract requirement or that the CDRL included ABS certification as a requirement for delivery. The United States alleged that on August 26, 2002, Bollinger's chief executive officer, Boysie Bollinger, advised Bollinger personnel that an ABS executive who was a former Coast Guard Commandant had offered to review the hull design of the modified patrol boats confidentially.[18] CEO Bollinger asked for the views of his staff

---

[14] *Id.*

[15] *Id.* at 7.

[16] *Id.*

[17] *Id.* at 6.

[18] *Id.*

as to whether or not to accept the offer.[19]  The complaint alleged that Bollinger vice president T.R. Hamblin responded by recommending that Bollinger decline ABS' offer to conduct a review. Then on August 27, 2002, CEO Bollinger allegedly replied to Hamblin:

> I'm concerned that [Kramek] sells CG on the fact that
> they need this review. . . . [ABS] would love the
> additional responsibility from the CG and as we both
> know, adverse results could cause the entire 123 to be
> an un-economical solution if we had to totally rebuild
> the hull. . . . MY CONCERN - we don't do anything - ABS
> gets CG to require it without our input, and the result
> is we BLOW the program.[20]

The United States alleged that on or about the same day an unidentified Bollinger employee or employees performed a series of calculations of the 123-foot patrol boat section modulus.[21] They allegedly ran the Midship Section Calculator (MSC) program at least three times, changing input data, and obtaining results of 2,836, 3,037, and 5,232 cubic inches.[22] The United States alleged that Bollinger obtained the result of 5,232 cubic inches by changing the physical properties of the shape files included in the MSC model and by entering "data into the MSC program that

---

[19] *Id.*

[20] *Id.* at 7-8 (as quoted in the complaint)

[21] *Id.* at 8.

[22] *Id.*

did not reflect the actual structural characteristics of the converted vessels."[23]

On August 28, 2002, NGSS authorized Bollinger to proceed with the work "in anticipation of definitizing a Firm Fixed Price – type contract by 30 September 2002."[24] The original complaint did not allege when the contract was actually "definitized."[25] On September 4, 2002, Bollinger submitted to the Coast Guard an initial CDRL S012-11 report stating that the midship section modulus was 5,232 cubic inches.[26] This calculation was significantly lower than the 7,152 cubic inches calculation that Bollinger submitted during Phase 1, but still above the minimum section modulus of 3,113 cubic inches contained in the ABS Guide.[27] The complaint also alleged that Bollinger created an internal draft CDRL S012-11 report that showed a 3,037 cubic inches section modulus, but it did not submit this to the Coast Guard.

The United States alleged that on October 9, 2002, Bollinger held a Preliminary Design Review meeting at which Bollinger told the Coast Guard that ABS would review the midship section modulus

---

[23] *Id.* at 8-9.

[24] *Id.* at 8.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 5-6.

calculation and longitudinal strength.[28] The complaint alleged that on December 18, 2002, Bollinger informed the Coast Guard at a Critical Design Review Meeting that ABS had been engaged to review compliance with "ABS rules."[29] The United States further alleged that ABS did not certify or review Bollinger's section modulus calculations.[30] On December 16, 2002, Bollinger submitted a final CDRL S012-11 report with the same section modulus of 5,232 cubic inches as the September report.[31] In March 2004, Bollinger delivered to the Coast Guard the first converted patrol boat, the Matagorda, which the Coast Guard paid for.[32]

The United States alleged that on August 20, 2004, after the delivery of the Matagorda, a Bollinger Vice President signed CDRL S016 certifying compliance with applicable contract requirements.[33] On September 10, 2004, the Matagorda suffered a structural casualty.[34] The complaint alleged that the subsequent Coast Guard investigation found that Bollinger's reported measurements "overstated the actual section modulus depicting the

---

[28] *Id.* at 9

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.* at 10.

[34] *Id.*

longitudinal strength of the hull."[35] Bollinger retested the hull
strengths of the boats and reported an actual section modulus of
2,615 cubic inches.[36] The United States also alleged in its
complaint that on October 13, 2004, after the failure of the
Matagorda, Bollinger vice president Hamblin emailed CEO Bollinger
and others that, "we did lead the CG into a false sense of
security by telling them early on that the Section Modulus for a
123 would be 5230 inches cubed as opposed to the real number,
just above 2600."[37] The complaint alleged that between November
22, 2002, and December 26, 2006, the Coast Guard paid
approximately $78 million in response to 65 requests for payment
from ICGS for work performed by Bollinger.[38] The United States
alleged that all of the vessels supplied by Bollinger turned out
to be unseaworthy.[39] The parties executed a statute of
limitations tolling agreement on December 5, 2008.[40]

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 10-11.

[40] *Id.* at 11.  Before the government filed its complaint, it
had access to substantial information from its investigation into
the conduct of ICGS, Lockheed, NGSS, and Bollinger arising from
the WPB conversion project. R. Doc. 51 at 3, n. 3.  Bollinger
asserts that it made eleven document productions, totaling more
than 40,000 documents, made eight of its employees available for
interviews, and agreed to toll the statute of limitations for

## II. Legal Standard

Federal Rule of Civil Procedure 54(b) provides that an order that adjudicates fewer than all the claims among all the parties "may be revised at any time" before the entry of a final judgment. Fed.R.Civ.P. 54(b). As Rule 54 recognizes, a district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. Unit A Oct. 1981). Although the district court's discretion in this regard is broad, *see Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1414–15 (5th Cir.1993); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir.1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994) (en banc), it is exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays. *See generally* 18b Charles A. Wright et al., Federal Practice & Procedure: Jurisdiction § 4478.1 (2d ed.2002).

This Court generally evaluates motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment.[41] Although

---

potential legal claims to give the Department of Justice more time to complete its investigation. *Id.*

[41] *See, e.g., Rosemond v. AIG Ins.*, No. 08-1145, 2009 WL 1211020, at *2 (E.D.La. May 4, 2009) (Barbier, J.); *In re Katrina*

there may be circumstances in which a different standard would be appropriate, the present motion does not present such circumstances. *See, e.g., American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-16 (4th Cir.2003) ("true declaratory judgments ... trigger heightened standards for reconsideration"). The proper inquiry is therefore whether the moving party has "clearly establish[ed] either a manifest error of law or fact or ... present[ed] newly discovered evidence." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir.2005) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990)). A motion to reconsider is "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of [the order]." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir.2004).

## III. Discussion

In its motion for reconsideration, the United States argues that the Court erred in dismissing with prejudice its unjust enrichment claims and barring the United States from asserting

---

*Canal Breaches Consol. Litigation*, No. 05-4182, 2009 WL 1046016, at *1 (E.D.La. Apr.16, 2009) (Duval, J.); *Total Sleep Diagnostics, Inc. v. United Healthcare Ins. Co.*, No. 06-4153, 2009 WL 928646, at *2 (E.D.La. Mar.31, 2009) (Fallon, J.); *Town of Gramercy v. Blue Water Shipping Services*, No. 07-2655, 2009 WL 580445, at *1 (E.D.La. Mar.4, 2009) (Engelhardt, J.); *Letap Hospitality, L.L.C. v. Days Inn Worldwide, Inc.*, No. 08-1355, 2008 WL 2959649, at *2 (E.D.La. July 30, 2008) (Berrigan, J.).

liability under the FCA and common law fraud for claims for payment made after October 2004 when the Coast Guard gained knowledge of the actual section modulus of the converted boats.

A. Unjust Enrichment

The United States alleged that Bollinger was unjustly enriched at the expense of the United States and, in the absence of another remedy, Bollinger should be required to pay restitution. The Court held that the existence of a contract foreclosed the quasi-contractual remedy of unjust enrichment. The United States argues that this conclusion was factually erroneous because although the United States pleaded an express contract between the Coast Guard and ICGS, it never pleaded an express contract between the Coast Guard and Bollinger.[44] However, the Court's ruling was not dependant on an express contract between the Coast Guard and Bollinger. Instead, the Court dismissed the United States' unjust enrichment claim because the availability of any contractual remedy forecloses an unjust enrichment claim and the Coast Guard had a contractual remedy against ICGS. See Bamburg Steel Buildings, Inc. v. Lawrence General Corp., 817 So.2d 427, 438 (La. Ct. App. 2002) (explaining that the existence of a contract makes an unjust enrichment claim unavailable); See, e.g., United States v. United Techs. Corp., 51 F.Supp.2d 167, 200

---

[44] R. Doc. 73-1 at 3.

12

(D.Conn. 1999) (because claim of unjust enrichment is quasi-contractual, it is unavailable when there is an express contract). This is true even when the contractual remedy is against a third party. *See Conerly Corp. v. Regions Bank*, Civ. A. No. 08-813, 2008 WL 4975080, at *9 (E.D.La. November 20, 2008) (dismissing unjust enrichment claim because plaintiff had contractual remedy against a third party); *Otis Elevator Co. v. Hunt Const. Grp., Inc.*, No. 03-CV-71478, 2005 WL 1348742, at *7 (E.D. Mich. June 3, 2005)(dismissing unjust enrichment because "the work in question was covered by [plaintiff's] contract with [a third-party]."); *see also Kane Enters. v. MacGregor, Inc.*, 322 F.3d 371, 376 (5th Cir. 2003) (affirming dismissal of quantum meruit suit where plaintiff had contract with third party).

Here, the Court properly dismissed the United States' unjust enrichment claim because a contractual remedy was available. Although the Coast Guard did not contract directly with Bollinger, it did enter a contract with ICGS for the conversion of 110-foot patrol boats. Accordingly, the Coast Guard had a contractual remedy available against a third party, ICGS, for the conversion of the patrol boats.

The United States' First Amended Complaint further highlights the impropriety of an unjust enrichment claim by

13

detailing the contractual relationships between the parties.[45]
The First Amended Complaint alleges that the Coast Guard had an
express contract with ICGS, which subcontracted to NGSS, which in
turn subcontracted to Bollinger.[46] The United States alleges that
the contract between Bollinger and NGSS incorporated by reference
requirements from ICGS' contract with the Coast Guard.[47] It
alleges that Bollinger's "false data submission violated a flow-
down requirement in Bollinger's subcontract" with NGSS.[48] The
arrangement as alleged makes clear that contractual relationships
governed the contractors' work on the patrol boat conversion
project. Given that contractual provisions cover the scope of the
United States' action against Bollinger, the alternative remedy
of unjust enrichment is unavailable. The Court therefore denies
the motion for reconsideration of the dismissal of plaintiff's
unjust enrichment claim.

*B. Government Knowledge Defense*

    The United States also argues that the Court erred in ruling
that the government knowledge defense bars the United States from
asserting FCA and fraud claims with respect to claims for payment

---

[45] R. Doc. 81 at 5.

[46] R. Doc. 74 at 7-8.

[47] *Id.*

[48] *Id.* at 11.

14

submitted after the Matagorda failed and the United States
learned the true section modulus of the converted vessels.[49] The
United States argues that it was legal error to apply the
government knowledge defense on a motion to dismiss. The
government's argument fails to justify reconsideration.

First, the Court's discussion of the government knowledge
defense was in the alternative to the Court's ruling that the FCA
and fraud claims must be dismissed because the complaint failed
to "state with particularity the circumstances constituting
fraud" as required by Federal Rule of Civil Procedure 9(b). The
Court noted that the government's knowledge undermined the
plausibility of its claim that the misrepresentations were
material to its payment of claims after October 2004.

Second, the government's motion for reconsideration has
failed to clearly establish a manifest error of law or fact or
presented newly discovered evidence. *Ross*, 426 F.3d at 764.
Instead, the United States simply advances an "argument[] that
could have been offered or raised" in its briefing on Bollinger's
motion to dismiss the first complaint. *Templet v. HydroChem Inc.*,
367 F.3d 473, 478–79 (5th Cir.2004). In its opposition to the
first motion to dismiss, the United States did not deny that it
knew about the erroneous section modulus calculations in August
2004 as a result of the Coast Guard's investigation and yet

---

[49] R. Doc. 73-1 at 3-10.

15

continued to pay claims for work done by Bollinger. Rather, it argued that FCA liability continued after the Coast Guard learned of the true section modulus because sunk costs required the Coast Guard to continue accepting the flawed vessels in the hope of repairing them.[50] Now that the Court has rejected its "sunk costs" theory, the United States attempts to avoid dismissal by arguing that the government knowledge defense cannot be applied at the motion to dismiss stage. It has cited no controlling law to this effect. Rather, the cases it cited are out of circuit and context specific. For example, in *Hagood v. Sonoma Country Water Agency*, 929 F.2d 1416 (9th Cir. 1991), the court refused to apply the government knowledge theory on a motion to dismiss when the specific facts alleged in the complaint were insufficient to establish the defense. Indeed, if a defense appears on the face of the complaint, a motion to dismiss is proper. Wright and Miller, 5 Fed. Prac. & Proc. Civ. § 1277 (3d ed.). The United States cites no authority for the proposition that the government knowledge defense is not applicable when the government pleads that the contracting agency conducted an investigation into product failure and discovered the misrepresented specification that caused the failure, and then nevertheless continued to accept and pay for products from the contractor. Finally, the Court fully considered and applied Fifth Circuit law on this

---

[50] R. Doc. 49 at 14 n.9.

issue. Because the United States does not point to any new facts or controlling law which dictate a different ruling, its motion for reconsideration is unavailing.

**III. Conclusion**

For the foregoing reasons, the United States' motion for reconsideration is DENIED.

New Orleans, Louisiana, this ___1st___ day of August, 2013.

_____

**SARAH S. VANCE
UNITED STATES DISTRICT JUDGE**

17