UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                CIVIL ACTION

VERSUS                                  NO: 12-920

BOLLINGER SHIPYARDS, INC., ET AL.       SECTION: R(5)

**ORDER AND REASONS**

Before the Court is defendant Bollinger's[1] motion to dismiss the United States' First Amended Complaint.[2] For the following reasons, the Court GRANTS Bollinger's motion to dismiss.

**I. Background**

*A. Procedural History*

On July 29, 2011, the United States filed its original complaint against Bollinger based on allegations that "Bollinger knowingly misled the Coast Guard to enter into a contract for the lengthening of Coast Guard cutters by falsifying data relating to the structural strength of the converted vessels."[3] The complaint alleged five causes of action: (1) knowingly presenting false or fraudulent claims for payment or approval to the United States in violation of the False Claims Act ("FCA"), 31 U.S.C.A. §

---

[1] Defendants are Bollinger Shipyards, Inc., Bollinger Shipyards Lockport, L.L.C. and Halter-Bollinger Joint Venture, L.L.C. (collectively "Bollinger").

[2] R. Doc. 83.

[3] R. Doc. 1 at 1.

3729(a)(1)(A); (2) knowingly making false records or statements material to false or fraudulent claims for payment by the United States in violation of the FCA, § 3729(a)(1)(B); (3) common law fraud; (4) negligent misrepresentation; and (5) unjust enrichment.[4] Bollinger filed a motion to dismiss, which the Court granted.[5] The Court dismissed all of the claims but granted the United States leave to amend its FCA and common law fraud claims.[6]

The United States then filed its First Amended Complaint, alleging FCA violations, common law fraud and unjust enrichment.[7] As stated, however, in dismissing the original complaint the Court granted the United States leave to amend only its FCA and common law fraud claims.[8] Accordingly, its unjust enrichment claim does not persist. This order proceeds to discuss only the United States' FCA and common law fraud claims.

---

[4] *Id.* at 11-13.

[5] R. Doc. 71.

[6] *Id.* at 40.

[7] R. Doc. 74 at 20-21. The United States also filed a motion for reconsideration of certain rulings in the Court's order dismissing the original complaint. R. Doc. 73. The Court denied this motion. R. Doc. 131.

[8] R. Doc. 71 at 40.

2

In the First Amended Complaint, the United States no longer advances a theory of fraud in the inducement of the contract. Rather, it now relies exclusively on a theory of fraud in the inducement of acceptance of delivery and of payment.[9] The factual allegations in the First Amended Complaint are substantially similar to those in the original complaint, although the amended complaint includes some new allegations seeking to support the claim that Bollinger knowingly generated and presented false measurements to the Coast Guard. Bollinger moved to dismiss the First Amended Complaint in its entirety for failure to state a claim.[10]

*B. Factual Allegations*

The United States' First Amended Complaint alleges the following facts. In 1999, the Coast Guard inaugurated its Deepwater program to replace its fleet of water vessels, aircraft and electronics systems.[11] Integrated Coast Guard Systems ("ICGS") competed to serve as lead contractor of the program.[12] ICGS submitted a proposal that included modification of existing 110-foot cutters (patrol boats) into 123-foot cutters.[13] The

---

[9] R. Doc. 74 at 1-2; R. Doc. 89 at 13-14.

[10] R. Doc. 83.

[11] R. Doc. 74 at 4.

[12] *Id.*

[13] *Id.* at 5.

proposal provided that ICGS would subcontract a portion of the conversion work to Northrup Gruman Ship Systems ("NGSS").[14] NGSS in turn would subcontract a substantial portion of the work to Bollinger, which had built the original fleet of 110-foot cutters.[15]

On September 27, 2000, the Coast Guard notified ICGS and Bollinger "that lengthening the vessel will increase primary stress in the hull girder, but that no analysis has been performed to investigate if the increase in hull girder bending moment will be acceptable."[16] The Coast Guard informed ICGS and Bollinger that the sources of its concern included the "significant hull degradation" of the 110-foot cutters.[17]

In response to the Coast Guard's concerns, Bollinger prepared a longitudinal strength analysis.[18] Bollinger's chief naval architect, Robert Riviere, stated internally that the 123-foot design exceeded American Bureau of Shipping ("ABS") standards by a factor greater than two.[19] On October 3, 2000, Bollinger submitted to the Coast Guard its analysis, indicating

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 5-6.

[18] *Id.* at 6.

[19] *Id.*

that the design satisfied ABS standards.[20] Specifically, Bollinger stated that "the required section modulus [a measure of longitudinal strength] is 3113 [cubic inches] and the actual section modulus is 7152 [cubic inches]."[21] Bollinger obtained the figure of 7,152 cubic inches using thicker hull plating in its calculation than actually existed in the 110-foot cutters.[22]

On August 7, 2001, NGSS notified Bollinger by email that NGSS's contract with ICGS required that NGSS use ABS to certify compliance with ABS standards.[23]

On June 25, 2002, the Coast Guard named ICGS the lead contractor of the Deepwater program.[24] The contract required ICGS and its subcontractors to provide the Coast Guard with a Hull Load and Strength Analysis ("HLSA") to verify that the 123-foot cutter modification design met program and contract requirements.[25] The contract incorporated an attachment that required ICGS to use ABS to certify compliance with ABS standards.[26] The United States points to no provision of the

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 6-7.

[23] *Id.* at 7.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 11-12.

5

contract specifying the content of this review or when it was supposed to take place.

In August 2002, the Coast Guard issued the first of four delivery task order under the ICGS contract for the design and modification of eight 123-foot cutters.[27]

On August 26, 2002, Bollinger's chief executive officer, Boysie Bollinger, sent an email to Bollinger vice president T.R. Hamblin, as well as to other Bollinger officials.[28] The email stated that ABS's Robert Kramek had offered a structural analysis of the 123-foot cutter design.[29] The email stated that ABS would provide a "confidential assessment."[30] Boysie Bollinger requested the views of Hamblin and the other email recipients as to whether to accept Kramek's offer.[31] Hamblin replied, recommending that Bollinger decline the offer.[32] Although the United States characterizes Hamblin's reply as an indication of concern that ABS review would reveal deficiencies in the 123-foot design,[33] it provides no specific language from the email and does not dispute

---

[27] *Id.* at 8.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 8-9.

[31] *Id.* at 9.

[32] *Id.*

[33] *Id.*

Bollinger's statement that Hamblin relayed "business reasons" for declining the offer.[34] Bollinger quotes the email as stating, "I see absolutely NO benefit to doing this. It is not a requirement for the contract and would only cost money and eat up engineering time to assist with the review."[35]

On August 27, 2002, Boysie Bollinger replied to Hamblin's email, stating, "I'm concerned that [Kramek] sells [the Coast Guard] on the fact that they need this review. . . . [ABS] would love the additional responsibility from the [Coast Guard] and as we both know, adverse results could cause the entire 123 to be an un-economical solution if we had to totally rebuild the hull. . . . MY CONCERN - if we don't do anything - ABS gets [the Coast Guard] to require it without our input, and the result is we BLOW the program."[36]

"On or about" the same day, Bollinger made three calculations assessing the 123-foot cutter section modulus.[37] For each calculation, it input six values into a software program to manually input the shape property of a structural support known as a bulb-T.[38] For the first calculation, Bollinger input three

---

[34] R. Doc. 83-1 at 10 n. 9.

[35] *Id.*

[36] R. Doc. 74 at 9.

[37] *Id.*

[38] *Id.* at 10.

7

correct values and three incorrect values.[39] The first calculation resulted in a section modulus of 3,037 cubic inches.[40] For the second calculation, it input the same six input values for the bulb-T shape property, but changed the material on a structural shape known as the C-channel.[41] The second calculation resulted in a section modulus of 2,836 cubic inches.[42] For the third calculation, Bollinger retained the change in material used in the second calculation, but altered the input values for the bulb-T shape property.[43] For this calculation, it input two correct values and four incorrect values.[44] Of the four incorrect values, one was retained from the earlier calculations and three were increased values.[45] One of the new inputs was over 16,000 times greater than the correct input value.[46] The third calculation resulted in a section modulus of 5,232 cubic inches.[47]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

The United States alleges that Bollinger has failed or refused to identify the employee or employees who made these calculations.[48] The United States acknowledges, however, that the HLSA later submitted by Bollinger, which relied on these calculations, stated that Bollinger naval architect David Chatham "performed" the calculations, Bollinger chief naval architect Robert Riviere "checked" the calculations, and Bollinger vice president Dennis Fanguy "reviewed [the HLSA] and approved its release."[49] Thus, by the United States' own admission, Bollinger apparently has identified the employees responsible for the calculations.

On August 28, 2002, NGSS authorized Bollinger to proceed with the conversion work.[50] The authorization provided, "The Subcontractor acknowledges that it is a subcontractor of [NGSS] for work to be performed by NGSS under its subcontract with [ICGS], the Prime Contractor. The Subcontractor agrees . . . that it will perform its subcontract in a manner which is consistent in every way with the requirements of the Prime Contract."[51]

"On or about" August 30, 2002, Bollinger prepared a draft version of the HLSA identifying the section modulus as 3,037

---

[48] *Id.* at 9, 13.

[49] *Id.* at 12-13.

[50] *Id.* at 11.

[51] *Id.* at 11.

cubic inches.[52] Bollinger circulated this draft internally but did not share it with the Coast Guard.[53]

On September 4, 2002, Bollinger submitted to the Coast Guard an initial HLSA, reporting a section modulus of 5,232 cubic inches.[54] Bollinger wrote that the analysis demonstrated that the 123-foot cutter's "final configuration meets ABS requirements" and that "the 123 conversion has adequate section modulus to meet ABS High Speed Rules after modification."[55] Specifically, Bollinger stated, "The required section modulus is 2714 [cubic inches] and the actual section modulus of the 123 foot patrol boat is 5232 [cubic inches]."[56]

On October 9, 2002, in a meeting with Bollinger, the Coast Guard expressed concern over the validity of the 5,232 cubic inches section modulus calculation, in light of Bollinger's prior calculation of 7,152 cubic inches.[57] An unnamed Bollinger

---

[52] *Id.* at 12.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 13.

[56] *Id.* As stated, on October 3, 2000, Bollinger submitted an analysis indicating that the required section modulus under ABS standards was 3,113 cubic inches. *Id.* at 6. The First Amended Complaint does not address why, by September 4, 2002, Bollinger identified the required section modulus under ABS standards as 2,714, rather than 3,113, cubic inches.

[57] *Id.* at 14.

employee told the Coast Guard that ABS would review the midship section modulus calculation and the vessel's longitudinal strength.[58] The United States alleges that Bollinger never requested, and ABS never conducted, such review.[59]

On November 22, 2002, the Coast Guard began issuing payments to ICGS on the delivery task order for the work performed by Bollinger.[60]

On December 16, 2002, Bollinger submitted its final version of the HLSA, reporting a section modulus of 5,232 cubic inches.[61]

On December 18, 2002, in a meeting with the Coast Guard, an unnamed Bollinger employee represented that Bollinger had engaged ABS to review compliance with ABS standards.[62]

In May and August of 2003, the Coast Guard issued three additional delivery task orders under the ICGS contract for the design and modification of 123-foot cutters.[63]

In March 2004, Bollinger delivered the first 123-foot cutter, U.S. Coast Guard cutter Matagorda.[64] The Coast Guard

---

[58] *Id.*

[59] *Id.*

[60] *Id.* at 17.

[61] *Id.* at 14.

[62] *Id.* at 15.

[63] *Id.* at 8.

[64] *Id.* at 15.

accepted the cutter and made "additional payments."[65] Between March and September, 2004, the Coast Guard accepted delivery of three additional 123-foot cutters.[66]

The United States alleges that on August 20, 2004, Bollinger vice president Dennis Fanguy, on behalf of Bollinger, certified compliance with applicable contract requirements, including a requirement that the 123-foot cutters would be "reviewed for unrestricted service."[67] The United States does not allege that this review would have included review of the section modulus or hull design. It alleges that Fanguy incorrectly certified that compliance with this requirement, and other requirements, had been "verified by a representative of an independent agency."[68]

---

[65] *Id.*

[66] *Id.* at 16, 17.

[67] *Id.* at 15.

[68] *Id.* In its memorandum in support of its motion to dismiss, Bollinger disputes the United States' characterization of the certification signed by Fanguy. R. Doc. 83-1 at 16 n. 11. Specifically, Bollinger states, and the United States does not refute, that "the face of the certification explicitly states that it certifies ABS review per the 'certification document issued by ABS Letter Report . . . Number MC510848' – a letter that is attached to the [certification] and enumerates exactly what ABS reviewed. The certification is facially accurate. Moreover, the certification is only made with regard to Matagorda, not all eight converted [cutters]." *Id.* (emphases removed).

On September 10, 2004, Coast Guard cutter Matagorda suffered a structural casualty that included buckling of the hull.[69] Later investigation revealed that Bollinger's calculations overstated the actual section modulus.[70] Bollinger recalculated the "true section modulus" at 2,615 cubic inches.[71]

On October 13, 2004, Hamblin stated in an email to Boysie Bollinger and other Bollinger officials, "we did lead the [Coast Guard] into a false sense of security by telling them early on that the Section Modulus for 123 would be 5230 inches cubed as opposed to the real number, just above 2600."[72]

On October 22, 2004, the Coast Guard notified ICGS that it would not accept delivery of additional 123-foot cutters until a structural fix had been implemented to correct the design defect.[73] ICGS made two structural modifications.[74] In reliance on the feasibility of the modifications, the Coast Guard accepted delivery of four additional 123-foot cutters.[75] Ultimately, the

---

[69] R. Doc. 74 at 15.

[70] *Id.* at 15-16.

[71] *Id.* at 16.

[72] *Id.*

[73] *Id.* at 17.

[74] *Id.*

[75] *Id.*

structural modifications proved inadequate, and the Coast Guard removed the 123-foot cutters from service.[76]

The Coast Guard continued issuing payments to ICGS for work performed by Bollinger through December 26, 2006, "or soon thereafter."[77]

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239, 244 (5th Cir. 2009). The Court is not bound to accept as true legal

---

[76] *Id.*

[77] *Id.* In the order dismissing the United States' original complaint, the Court foreclosed liability "for all claims for payment made after the government knew that the section modulus was incorrect." R. Doc. 71 at 24. This is because, under the "government knowledge defense," the FCA does not apply where "the government knows and approves of the particulars of a claim for payment before that claim is presented." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (quoting *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999)) (quotation marks removed).

conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Id.* It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly,* 550 U.S. at 555. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 256. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n.9 (5th Cir. 2007), the claim must be dismissed.

The FCA and common law fraud claims that the Court permitted the United States to amend must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard supplements the pleading requirements of Federal Rule of Civil Procedure 8(a),

15

and together the two rules necessitate that a plaintiff supply "simple, concise, and direct" allegations of the circumstances amounting to fraud. *Grubbs*, 565 F.3d at 186. These allegations "must make relief plausible, not merely conceivable, when taken as true." *Id.*; *see also Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 570.

In order to plead fraud with particularity, "a plaintiff must state the factual basis for the fraudulent claim with particularity and cannot rely on speculation or conclusional allegations." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008). In general, such a statement should include the "time, place, and contents of the false representation[], as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Grubbs*, 565 F.3d at 186 (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Group.*, 193 F.3d 304, 308 (5th Cir. 1999)); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

In certain circumstances, the pleading requirements of Rule 9(b) may be slightly relaxed and the plaintiff may plead on information and belief, in particular when facts about the fraud are "peculiarly within the perpetrator's knowledge." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003) (quoting *Russell*, 193 F.3d at 308); *see also United States*

16

*ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 454 (5th Cir. 2005). Such relaxation, however, "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Thompson*, 125 F.3d at 903 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

## III. Discussion

*A. False Claims Act*

In its First Amended Complaint, the United States alleges violations of two different provisions of the FCA.[78] The first provision, 37 U.S.C. § 3729(a)(1)(A), imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government. The second provision, section 3729(a)(1)(B), imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

For the purposes of the statute, "knowing" and "knowingly" mean that a person either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of

---

[78] The subsections of § 3729 were reorganized by statute in 2009 as part of the Fraud Enforcement and Recovery Act of 2009. See Pub.L. No. 111-21, 123 Stat. 1617, 1621-22 (2009). References will be to the current version of the statute.

the truth or falsity of the information." 37 U.S.C. §
3729(b)(1)(A). The mental-state requirement of the FCA requires
nothing more. *Id.* § 3729(b)(1)(B).

Liability for a violation of sections 3729(a)(1)(A) and (B)
of the FCA rests on "(1) whether there was a false statement or
fraudulent course of conduct; (2) made or carried out with the
requisite scienter; (3) that was material; and (4) that caused
the government to pay out money or to forfeit moneys due (*i.e.*,
that involved a claim)." *United States ex rel. Longhi v. Lithium
Power Techs.*, 575 F.3d 458, 467 (5th Cir. 2009)(quoting *United
States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d
370, 376 (4th Cir. 2008)) (quotation marks removed).

The United States alleges that Bollinger made false
statements that fraudulently induced the Coast Guard to accept
delivery of the 123-foot cutters and to pay for the cutters. It
identifies as material false statements only Bollinger's
September 4, 2002, initial HLSA and December 16, 2002, final
HLSA, both of which allegedly overstated the section modulus of
the 123-foot cutter design.[79] Although the United States alleges
additional false statements made by Bollinger, including
Bollinger's oral assertions that ABS would review the 123-foot
design,[80] it does not argue that these statements are material

---

[79] R. Doc. 89 at 10.

[80] R. Doc. 74 at 14, 15.

18

false statements triggering FCA liability,[81] and the Court agrees
that they are not.[82] Thus, the United States' theory relies on
the proposition that the inaccurate section modulus figure
reported in the HLSA was a material, false statement, made with
the requisite scienter, that caused the government to pay out
money. *See Longhi*, 575 F.3d at 467.

Taken as true, however, the United States' factual
allegations fail to make plausible that Bollinger submitted the
HLSA with actual knowledge of the inaccuracy of the section
modulus calculation, or in reckless disregard or deliberate
ignorance of its accuracy. Because the United States has not
alleged with particularity, pursuant to Rule 9(b), that Bollinger
made material false statements with the requisite scienter, its

---

[81] R. Doc. 89 at 10.

[82] The Court agrees that the oral statements regarding ABS
review are not material, because there is no indication that ABS
certification of the section modulus was a "prerequisite" for
payment under the Coast Guard's contract with ICGS. *See United
States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268
(5th Cir. 2010). In fact, the Coast Guard accepted delivery of
the converted 123-foot cutters and issued payment for the cutters
without any such certification. Thus, Bollinger's representations
regarding ABS review do not appear to have had "the potential to
influence the government's decisions." *Longhi*, 575 F.3d at 470.
The United States offers Bollinger's oral statements regarding
ABS review only to show that Bollinger was deliberately ignorant
or reckless as to the accuracy of the reported section modulus,
and to show that Bollinger attempted to conceal the falsity of
the reported section modulus by avoiding ABS review. R. Doc. 74
at 1; R. Doc. 89 at 11, 13, 15-16.

theory of FCA liability cannot survive Bollinger's motion to dismiss.

At the core of the United States' theory are its allegations that Bollinger made three section modulus calculations in 2002 and submitted only the highest calculation to the Coast Guard. The United States argues that Bollinger's multiple calculations using incorrect inputs, together with Boysie Bollinger's contemporaneous email expressing concern over possible ABS review, lead to the inference that "Bollinger knowingly input false data . . . to obtain a false section modulus result high enough to avoid further Coast Guard scrutiny and ABS review of the vessel's structural integrity."[83]

This inference is not reasonable. The First Amended Complaint does not allege that Bollinger, when it made the three incorrect calculations in 2002, knew that the actual section modulus of the 123-foot cutter design was 2,615 cubic inches. Nor does it allege that Bollinger had in its possession the complete set of correct inputs necessary to calculate the section modulus. The United States argues simply that three incorrect calculations suggest an effort to fabricate. This is unpersuasive. All three calculations included multiple incorrect inputs, suggesting that Bollinger did not know the correct inputs, not that it knew the correct inputs but reported a section modulus using incorrect

---

[83] R. Doc. 74 at 11.

inputs. Further, the allegation that one of the incorrect values in the reported calculation was 16,000 times greater than the correct input is of little significance without knowing the context and nature of these inputs.

Similarly, that Bollinger reported only the highest of the three section modulus figures to the Coast Guard does not indicate that it acted with the requisite scienter. The United States does not allege that either of the two unreported figures was correct or should have been reported. Rather, the First Amended Complaint indicates that none of the three alleged calculations of 3,037, 2,836 and 5,232 cubic inches matched the "true section modulus" of 2,615 cubic inches.[84] Thus, there is no allegation that Bollinger knew the "true" section modulus and concealed the correct calculation in its HLSA. Similarly, that Bollinger circulated an internal draft HLSA with a section modulus of 3,037 cubic inches before reporting to the Coast Guard a section modulus of 5,232 cubic inches suggests that Bollinger considered both figures and chose one incorrect figure over another. There is no allegation that any relevant document – and the United States has had access to hundreds of thousands in this litigation[85] – suggests any particular reason why Bollinger chose

---

[84] *Id.* at 16.

[85] R. Doc. 96 at 1. The United States' First Amended Complaint follows a years-long Coast Guard investigation, a Department of Justice investigation and substantial discovery in

one figure over another, much less that the reason was to choose a false number that was higher than the minimum ABS requirement.

To bolster its claims of scienter, the United States points to the 2002 email exchange between Boysie Bollinger and Hamblin, which allegedly occurred contemporaneously with the three incorrect calculations. The United States alleges that Boysie Bollinger, in his August 27, 2002, email, implicitly indicated that "Hamblin should take steps to avoid ABS review of the design of the complete hull."[86] For several reasons, the First Amended Complaint offers inadequate factual predicate for this assertion.

First, on its face Boysie Bollinger's email says nothing about taking steps to evade ABS review, much less falsifying figures. The First Amended Complaint gives no explanation as to why Hamblin or the other email recipients would believe that falsifying section modulus calculations was the proper response to Boysie Bollinger's concerns. Neither does it specify how the alleged plan was developed or communicated to lower level employees.

Second, there is no allegation that Boysie Bollinger knew in 2002 that the actual section modulus of the 123-foot design was insufficient under ABS, or any other, standards. The First

---

this litigation, including production of hundreds of thousands of relevant documents, interviews with eight Bollinger employees and responses to written discovery requests. *Id.* at 1-2.

[86] R. Doc. 74 at 9.

Amended Complaint alleges that in 2000 Bollinger's chief naval architect, Robert Riviere, stated internally that the 123-foot design exceeded ABS standards by a factor greater than two. The United States does not allege that, at any point between Riviere's internal statement in 2000 and Boysie Bollinger's emails in 2002, Riviere or any other Bollinger employee stated that the design did not exceed ABS standards. Thus, it is reasonable to infer that at the time of his 2002 emails Boysie Bollinger did not know that the section modulus was insufficient under ABS standards.

Third, Boysie Bollinger's two emails actively entertain ABS's offer of a confidential review and ultimately express ambivalence as to whether Bollinger should engage ABS for a confidential assessment of the 123-foot design. His first email "request[s] the views of Hamblin and the other email recipients as to whether to accept ABS' offer," while his second email expresses concern over the possible consequences if Bollinger were to decline the offer.[87] If Boysie Bollinger knew that the section modulus was insufficient, it is unlikely that he would have entertained ABS's offer for an assessment.

Fourth, Boysie Bollinger's second email indicates that he was primarily concerned with the possibility of ABS reviewing the design without Bollinger's input. The email states, "MY CONCERN –

_____

[87] *Id.*

23

we don't do anything – ABS gets [the Coast Guard] to require it
without our input, and the result is we BLOW the program."[88] If
Boysie Bollinger knew that the section modulus was insufficient,
presumably he would have been concerned about ABS review with or
without Bollinger's input. His email reads most naturally as
expressing a desire that Bollinger be involved in any ABS review,
to answer questions and provide information or insights that
could help ABS evaluate the design.

Fifth, the First Amended Complaint alleges that Bollinger
was contractually obligated to engage ABS to certify compliance
with ABS standards.[89] The United States does not explain whether
or to what extent this required certification overlapped with the
review Kramek offered to conduct confidentially and Boysie
Bollinger allegedly sought to avoid. The United States' theory on
this point is obscure. Bollinger's email suggests his belief that
the proffered ABS review was not contractually required by the
Coast Guard, not a belief that he could somehow escape an
existing requirement by turning it down. Further, if Bollinger
expected a non-confidential ABS review per contract requirements,
it does not follow that it could escape this ABS review by
falsifying section modulus figures or avoiding a confidential
review by ABS.

---

[88] *Id.*

[89] *Id.* at 7, 11-12.

In sum, Boysie Bollinger's emails do not suggest an intent either to avoid ABS review at all costs or to falsify section modulus calculations. The inferential leap the United States urges - that Boysie Bollinger implicitly instructed his subordinates to take steps to avoid ABS review, and that they responded by falsifying calculations - is simply not reasonable.

Neither do Bollinger's October 9 and December 18, 2002, oral statements that ABS would review the 123-foot design suggest that Bollinger acted with knowledge of the falsity of the reported section modulus, or with reckless disregard or deliberate ignorance of its accuracy. The statements do not evince fraudulent intent simply by virtue of being incorrect. Further, the United States does not specify who made these statements on Bollinger's behalf, or allege that the speakers knew that the statements were incorrect.

The United States concedes that Hamblin's 2004 email, which states that "we did lead the [Coast Guard] into a false sense of security," has no bearing on Bollinger's knowledge in 2002.[90] The United States offers Hamblin's 2004 email only to establish "the materiality of the section modulus result."[91]

Similarly, the August 20, 2004, certification signed by Bollinger vice president Dennis Fanguy has no bearing on

---

[90] R. Doc. 89 at 15.

[91] *Id.*

Bollinger's knowledge in 2002. It is unclear what significance the United States ascribes to the certification. In its opposition to Bollinger's motion to dismiss, it implies that the certification itself, which states that an "independent agency" reviewed the 123-foot vessel for "unrestricted service," might qualify as a material false statement.[92] But the certification post-dates the Coast Guard's acceptance of the Matagorda by several months, and appears as well to post-date the Coast Guard's acceptance of one or more of the next three cutters.[93] Thus, the certification could not have induced the Coast Guard to accept delivery of the vessels. Moreover, the United States does not allege that Fanguy knew that the certification was inaccurate when he signed it or what the independent agency review was to consist of that was not done.

Finally, the allegations in the First Amended Complaint lead to the inference that the Coast Guard was aware of the variability of the section modulus when it accepted delivery of the cutters. Bollinger's 2002 section modulus calculations, including the 5,232 cubic inches reported to the Coast Guard, were all significantly lower than its prior calculation of 7,152

---

[92] *Id.* at 16.

[93] According to the First Amended Complaint, the Coast Guard accepted the second, third and fourth cutters sometime between March 2004, when Bollinger delivered the Matagorda, and September 2004, when the Coast Guard received notice "that Bollinger had submitted a materially false section modulus." R. Doc. 74 at 16.

cubic inches. The only reason the United States offers as to why the Coast Guard was willing to proceed with the program after a drop of almost 2,000 cubic inches in the reported section modulus is that Bollinger orally represented that ABS would review the calculation. Yet the Coast Guard accepted delivery of the Matagorda and the other 123-foot cutters without any confirmation that such review had taken place. Moreover, the Coast Guard continued issuing payments for Bollinger's work for more than two years after the structural failure of the Matagorda. These circumstances suggest that the government knew that the reported section modulus might be incorrect and was willing to pay anyway. There can be no FCA liability in such circumstances. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) ("government knowledge defense").

The United States has failed to allege facts that allow the inference that Bollinger acted knowingly or with reckless disregard or deliberate ignorance of the truth. Because its First Amended Complaint lacks a plausible theory of fraudulent inducement of acceptance of delivery or of payment, the Court must dismiss the United States' FCA claims.

*B. Common Law Fraud*

The United States also makes a claim that Bollinger's actions constituted common law fraud. As with the FCA claims, a

27

common law fraud claim is subject to the heightened pleading requirements of Rule 9(b).

In its opposition to Bollinger's motion to dismiss the original complaint, the United States asserted that its common law fraud claim is governed by federal, not state, law.[94] As the Court determined in its order dismissing the original complaint, "the elements of fraud are essentially the same under both federal and Louisiana law."[95] To make out a claim for fraud under either federal or Louisiana law, a plaintiff must show that the defendant made a material false representation with the requisite scienter and that the plaintiff relied on it. *See Pence v. United States*, 316 U.S. 332, 338 (1942); *United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 52 (D.D.C. 2011); *Wooley v. Lucksinger*, 14 So. 3d 311, 378-79 (La. App. 1st Cir. 2008). The scienter requirement for common law fraud, which calls for the plaintiff to show that the defendant had the specific intent to deceive, is stricter than the "knowing" element of FCA claims. *See Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 442 (5th Cir. 2011).

The United States bases its fraud claim on the same allegations it relies on for its FCA claims.[96]  As explained

---

[94] R. Doc. 49 at 18-19.

[95] R. Doc. 71 at 25.

[96] R. Doc. 74 at 20-21.

28

*supra* at § III(A), those allegations, taken as true, fail to establish that Bollinger knowingly submitted false material information to the Coast Guard. Thus, the United States' allegations also fail to satisfy the higher standard of specific intent, and its fraud claim must be dismissed.

*C. Leave to Amend*

The United States has failed to cure the deficiencies in its complaint by amendment. Given the advanced stage of discovery and the United States' failure to plead a plausible theory of fraud in its First Amended Complaint, the Court concludes that further amendment would be futile. Accordingly, the Court declines to grant the United States leave to amend its FCA and common law fraud claims. *See Jamieson By and Through Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985).

**IV. Conclusion**

For the foregoing reasons, Bollinger's motion to dismiss the First Amended Complaint is GRANTED with prejudice.

New Orleans, Louisiana, this ___21st___ day of October, 2013.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE