IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
December 23, 2014

No. 13-31301

Lyle W. Cayce
Clerk

D.C. Docket No. 2:12-CV-920

UNITED STATES OF AMERICA,

    Plaintiff - Appellant

v.

BOLLINGER SHIPYARDS, INCORPORATED; BOLLINGER SHIPYARDS LOCKPORT, L.L.C.; HALTER BOLLINGER JOINT VENTURE, L.L.C.,

    Defendants - Appellees

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before DAVIS, DeMOSS, and ELROD, Circuit Judges.

J U D G M E N T

    This cause was considered on the record on appeal and was argued by counsel.

    It is ordered and adjudged that the judgment of the District Court is reversed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

    IT IS FURTHER ORDERED that defendants-appellees pay to plaintiff-appellant the costs on appeal to be taxed by the Clerk of this Court.

Certified as a true copy and issued
as the mandate on Feb 16, 2015

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-31301

United States Court of Appeals
Fifth Circuit
**FILED**
December 23, 2014
Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

BOLLINGER SHIPYARDS, INCORPORATED; BOLLINGER SHIPYARDS LOCKPORT, L.L.C.; HALTER BOLLINGER JOINT VENTURE, L.L.C.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before DAVIS, DeMOSS, and ELROD, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

    The United States of America appeals from the district court's final judgment in which the court granted the defendants-appellees' motion to dismiss its False Claims Act case under FED. R. CIV. P. 12(b)(6). We conclude that the United States alleged sufficient facts in its complaint to allow a factfinder to infer that the defendants-appellees either knew that their statements were false or had a reckless disregard of their truth or falsity. We therefore REVERSE and REMAND for further proceedings consistent with this opinion.[1]

---

[1] The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1345, and we have jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291.

Case: 13-31301   Document: 00512937794   Page: 2   Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 3 of 18

No. 13-31301

## I. FACTS

The United States filed this action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, alleging that Bollinger Shipyards, Inc., Bollinger Shipyards Lockport, L.L.C., and Halter Bollinger Joint Venture, L.L.C. (collectively, "Bollinger") knowingly submitted false statements and false claims for payment to the government in relation to a government contract under which Bollinger was to modify eight vessels owned by the United States Coast Guard ("Coast Guard"). After allowing the United States to replead once, the district court granted Bollinger's second Rule 12(b)(6) motion to dismiss, holding that the United States failed to satisfy the plausibility and particularity requirements of the Federal Rules of Civil Procedure concerning Bollinger's knowledge under the FCA. The United States appeals this dismissal.

Because this case comes up on the grant of a motion to dismiss under Rule 12(b)(6), we review the district court's ruling de novo.[2] Generally, we "must assess whether the complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)."[3]

The facts as stated in the United States' First Amended Complaint are as follows: In 1999, the Coast Guard began a program called Deepwater to upgrade or replace its aging fleet of vessels, aircraft, and electronics systems. One of the contractors competing for the project was Integrated Coast Guard Ship Systems ("ICGS"). ICGS's proposal included converting existing 110-foot

---

[2] *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).
[3] *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014) (footnote omitted).

Case: 13-31301   Document: 00512937794   Page: 3   Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 4 of 18

No. 13-31301

Coast Guard patrol boats into 123-foot patrol boats to extend the service life of the boats by adding a 13-foot extension to the hulls, among other changes. Under this proposal, the conversion of the 110-foot boats would be subcontracted to Bollinger, which had originally built the boats.

In September 2000, the Coast Guard expressed concerns to Bollinger about the feasibility of converting the vessels and questioned whether the hulls of the converted vessels would have adequate structural integrity. In response, Bollinger prepared a longitudinal strength analysis describing the modified boats' projected "section modulus," a measure of longitudinal strength. Bollinger performed its calculation of the section modulus using the Midship Section Calculator ("MSC") program, which uses as inputs a number of components, including the structural geometry of the ship's hull, the physical and engineering properties of the hull, and shell plate material and thickness. Bollinger advised the Coast Guard that the minimum section modulus required by the American Bureau of Shipping ("ABS"), an independent organization that develops standards for shipbuilding, was 3,113 cubic inches, and the calculated section modulus for the proposed modified boats would be 7,152. As was later discovered, Bollinger reached this calculated section modulus by inputting a thicker hull plating than existed in the 110-foot boats. Bollinger did not advise the Coast Guard that it used a thicker hull plating in its calculations, and its proposal did not include a provision for replacing or thickening the hull in the boats. In August of 2001, Bollinger was notified that the Coast Guard would require Bollinger to certify compliance with ABS structural standards.

In June 2002, the Coast Guard then selected ICGS as the contractor for the Deepwater program and entered into a contract with ICGS. The contract required ICGS and its subcontractors, including Bollinger, to provide the Coast

Case: 13-31301    Document: 00512937794    Page: 4    Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 5 of 18

No. 13-31301

Guard with a "CDRL S012-11," a Hull and Load Strength Analysis, to verify that the 123-foot boat design met the program and contract requirements. The contract also required Bollinger to obtain ABS certification of compliance with ABS structural standards.

In August 2002, the Coast Guard issued the first of four delivery task orders under the contract for the design and modification of the 123-foot patrol boats. On August 26, 2002, Bollinger's chief executive officer, Boysie Bollinger, sent an email to other Bollinger officials stating that an ABS official had offered to provide a confidential assessment of the structural analysis of the converted vessels. Boysie Bollinger sought advice on whether to accept the offer. T.R. Hamblin, Bollinger's vice president, recommended declining the offer, reflecting concern that the review would find that the design required additional structural support. Boysie Bollinger replied:

> I'm concerned that [ABS] sells CG on the fact that they need this review. . . . [ABS] would love the additional responsibility from the CG and as we both know, adverse results could cause the entire 123 to be an un-economical solution if we had to totally rebuild the hull. . . . MY CONCERN—we don't do anything—ABS gets CG to require it without our input, and the result is we BLOW the program.

The same day this email exchange occurred, Bollinger found that the actual section modulus, without an increase in hull plating thickness, was less than the 7,152 cubic inches it reported to the Coast Guard. Bollinger ran the MSC application at least three times that day, changing the input data each time, and obtaining results of 2,836, 3,037, and 5,232 cubic inches. Each calculation used some incorrect inputs, with the 5,232 calculation having one input that was 16,000 times greater than the correct input value. A few days later, for internal purposes, Bollinger used the 3,037 value in its draft version

Case: 13-31301   Document: 00512937794   Page: 5   Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 6 of 18

No. 13-31301

of the CDRL S012-11. However, in an initial CDRL S012-11 sent to the Coast Guard on September 4, 2002, Bollinger submitted a section modulus of 5,232 cubic inches and certified that the section modulus met ABS requirements.

On October 9, 2002, Bollinger met with Coast Guard officials during a Preliminary Design Review meeting. To address the Coast Guard's concerns regarding the validity of the 5,232 cubic inch section modulus calculation in light of Bollinger's original calculation of 7,152, Bollinger told the Coast Guard that it would have ABS review the calculation and the vessels' longitudinal strength. Nonetheless, Bollinger never requested ABS review of the midship section modulus calculation and longitudinal strength, and ABS never performed this review. Bollinger submitted its final version of the CDRL S012-11 to the Coast Guard on December 16, 2002, reporting that the section modulus was 5,232 cubic inches and again certifying that the section modulus met ABS requirements. On December 18, 2002, during a Critical Design Review meeting with the Coast Guard, Bollinger represented that it had engaged ABS to review compliance with ABS standards; however, the ABS never reviewed the section modulus calculation.

In March 2004, the first 123-foot boat, the Matagorda, was delivered to and accepted by the Coast Guard. In September 2004, it was discovered that the Matagorda had suffered a structural casualty, including buckling of the hull. An investigation by the Coast Guard and a recalculation of the section modulus by Bollinger revealed that the true section modulus of the completed ship was 2,615 cubic inches, well below the ABS minimum of 3,113 cubic inches required by the contract and also below any figure Bollinger reported to the Coast Guard prior to delivery.

Before the Coast Guard realized that the section modulus number was incorrect, it had accepted delivery of four modified patrol boats. For vessels five

Case: 13-31301   Document: 00512937794   Page: 6   Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 7 of 18

No. 13-31301

through eight, the Coast Guard and ICGS pursued structural modifications to increase the section modulus, and made two structural modifications to the vessels. In reliance on the feasibility of the modifications, the Coast Guard accepted delivery of vessels five through eight. Ultimately, the structural modifications were inadequate, and the Coast Guard removed all eight boats from service. On May 17, 2007, the Coast Guard revoked its acceptance of the boats.

## II.   PROCEDURAL HISTORY

The United States brought suit against Bollinger under the FCA, alleging that Bollinger knowingly presented or caused to be presented false or fraudulent claims for payment to the United States and knowingly made statements material to false or fraudulent claims for payment or approval by the United States in violation of 31 U.S.C. § 3729(a)(1). The district court granted Bollinger's initial motion to dismiss with leave to amend the FCA claims. However, while granting leave to amend the FCA claims, the court applied the "government knowledge defense" to foreclose all FCA claims for payments made after the Coast Guard was made aware that the section modulus calculation was incorrect.

After the United States filed an amended complaint, the district court granted Bollinger's second motion to dismiss and entered final judgment in the case. The district court held that the United States failed to plead plausibly and with particularity that Bollinger acted "knowingly" in making false statements or claims for payment. The court again ruled that the "government knowledge defense" foreclosed the United States' claims for those payments made after the Coast Guard became aware that the section modulus calculation was incorrect. The United States timely appealed the final judgment dismissing its claims.

Case: 13-31301      Document: 00512937794     Page: 7     Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 8 of 18

No. 13-31301

### III. LAW AND ANALYSIS

#### A. The United States Properly Pleaded Knowledge.

The primary issue on appeal is whether the district court correctly held that the United States failed to sufficiently plead Bollinger's scienter. The resolution depends on the Rule 12(b)(6) standard set out above, the elements of an FCA claim, and the pleading requirements set out in FED. R. CIV. P. 8 and 9(b). On de novo review, we disagree with the district court's holding and conclude that the United States adequately pleaded Bollinger's scienter.

#### B. Applicable Law

A violation of the FCA occurs when (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."[4] To meet the "requisite scienter" requirement, the United States must plead that Bollinger acted with knowledge of the falsity of the statement, which is defined, at a minimum, as acting "in reckless disregard of the truth or falsity of the information."[5]

To state a claim under the FCA, the plaintiff must meet both the plausibility pleading standard of Fed. R. Civ. P. 8 and the heightened pleading standard of Fed. R. Civ. P. 9(b).[6] Thus, the United States must (1) plead "enough facts [taken as true] to state a claim to relief that is plausible on its face,"[7] and (2) plead "with particularity the circumstances constituting fraud

---

[4] *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).
[5] 31 U.S.C. § 3729(b)(1)(A)(iii).
[6] *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009).
[7] *Id.* (quoting *Twombly*, 550 U.S. at 570) (alteration in original).

7

Case: 13-31301    Document: 00512937794    Page: 8    Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 9 of 18

No. 13-31301

or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[8]

A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[9] The plausibility standard "does not give district courts license to look behind [a complaint's] allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial."[10] The particularity standard of Rule 9(b) generally requires the plaintiff to plead the time, place, and contents of the false representation and the identity of the person making the representation.[11] However, an FCA claim can meet Rule 9(b)'s standard if it alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."[12] Knowledge need not be pled with particularity under Rule 9(b); it need only be pled plausibly pursuant to Rule 8.[13]

### C.   The District Court Erred in Imposing a Higher Pleading Standard for Bollinger's State Of Mind.

As an initial matter, the district court erred by requiring the United States to plead the FCA's knowledge element with particularity under Rule 9(b).[14] The United States asserted in its First Amended Complaint that,

---

[8] FED. R. CIV. P. 9(b).

[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

[10] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011).

[11] *Grubbs*, 565 F.3d at 190.

[12] *Id.*

[13] *See* FED. R. CIV. P. 9(b); *Iqbal*, 556 U.S. at 686-87.

[14] *See United States v. Bollinger Shipyards, Inc.*, 979 F. Supp. 2d 721, 731 (E.D. La. 2013) ("Because the United States has not alleged with particularity, pursuant to Rule 9(b), that Bollinger made material false statements *with the requisite scienter*, its theory of FCA

Case: 13-31301 Document: 00512937794 Page: 9 Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN Document 176 Filed 02/23/15 Page 10 of 18

No. 13-31301

because Bollinger ran three different section modulus calculations with false inputs and submitted the highest to the United States, "it can be reasonably inferred that Bollinger knowingly input false data into the MSC application to obtain a false section modulus result high enough to avoid further Coast Guard scrutiny and ABS review of the vessel's structural integrity." This allegation complies with Rule 9(b)'s requirement that Bollinger's intent and knowledge be pled only generally, as well as Rule 8's requirement that the allegation be plausible.

The district court erroneously concluded that the fact "that Bollinger reported only the highest of the three section modulus figures to the Coast Guard does not indicate that it acted with the requisite scienter" because the United States failed to allege that Bollinger knew the correct section modulus figure and therefore concealed the true calculation.[15] Furthermore, the district court stated:

> There is no allegation that any relevant document—and the United States has had access to hundreds of thousands in this litigation—suggests any particular reason why Bollinger chose one figure over another, much less that the reason was to choose a false number that was higher than the minimum ABS requirement.[16]

The FCA does not require the United States to show that Bollinger knew the *correct* figure. The FCA is satisfied if the plaintiff alleges the defendant either knew that the figure was false or acted with reckless disregard of its truth or falsity. The facts alleged by the United States support the inference that Bollinger, at a minimum, acted with reckless disregard of the truth or

---

liability cannot survive Bollinger's motion to dismiss." (emphasis added)).
[15] *Id.* at 731.
[16] *Id.*

9

Case: 13-31301    Document: 00512937794    Page: 10    Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 11 of 18

No. 13-31301

falsity of the section modulus figures, including the highest figure it submitted to the Coast Guard. Equally significant, in rejecting the United States' argument for why Bollinger submitted the highest of three false figures to the United States, the district court did not consider the circumstantial evidence and general allegations of Bollinger's knowledge and intent. Therefore, the district court failed to apply the correct standard for pleading knowledge under Rules 8 and 9(b).

### D.  The District Court Erred In Drawing Inferences Against The United States And In Favor Of Bollinger.

Given that knowledge may be pled generally, we conclude the United States did plead facts making it more than a sheer possibility that Bollinger acted with knowledge.[17] The First Amended Complaint, viewed in the light most favorable to the United States, states a claim under the FCA. The district court erred by viewing the facts in the light most favorable to Bollinger and drawing inferences against the United States.

The complaint clearly alleges that all of the factors that Bollinger entered into the MSC to calculate the section modulus were within Bollinger's knowledge and control as the designer and builder of both the original 110-foot boats and the modified 123-foot boats. The complaint states that Bollinger realized on August 27, 2002, that with the correct hull-plate thickness, the ships did not meet the original projected section modulus value of 7,152 that it gave to the Coast Guard. Bollinger ran three section modulus calculations that produced results of varying section modulus strength. Bollinger used a lower figure internally and then submitted a higher figure to the United States.

---

[17] *See Iqbal*, 556 U.S. at 678.

Case: 13-31301    Document: 00512937794    Page: 11    Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 12 of 18

No. 13-31301

The United States also pointed to an email exchange from around the same time between Bollinger's CEO, Boysie Bollinger, and vice president, T.R. Hamblin, regarding an offer by ABS's Robert Kramer to perform a confidential structural analysis of a converted vessel. Mr. Hamblin recommended that Mr. Bollinger decline ABS's offer to conduct the analysis because, the United States contends, he was concerned that the ABS analysis would find that the design required additional structural support. Mr. Bollinger agreed with Mr. Hamblin and declined ABS's offer. In an email between Mr. Bollinger and Mr. Hamblin, Mr. Bollinger stated that "[ABS] would love the additional responsibility from the [Coast Guard] and as we both know, adverse results could cause the entire [conversion] to be an uneconomical solution if we had to totally rebuild the hull. . . . MY CONCERN—we don't do anything—ABS gets CG to require it without our input, and the result is we BLOW the program." The United States alleged this email implied that the vice president "should take steps to avoid ABS review of the design of the complete hull, a review likely to have exposed the inadequacy of the structural integrity of the hull." We agree that this is a permissible interpretation of the emails which would arguably support an inference that Bollinger was attempting to conceal the inadequate structural integrity of the hulls.

Bollinger eventually submitted the highest of three calculations (5,232) to the Coast Guard, while employing in its internal documents the middle calculation (3,037). The 5,232 figure submitted to the Coast Guard used one input value 16,000 times greater than the value that had been used in the other two calculations. Finally, even after the Coast Guard expressed concern over the section modulus of 5,232 and Bollinger represented that it would have ABS review the calculation, Bollinger did not have ABS do so.

11

No. 13-31301

On these facts, the district court improperly drew inferences in favor of Bollinger and focused on the fact that the United States failed to include certain facts in its complaint, none of which was necessary in this case which depends so much on circumstantial evidence. First, the district court found that Mr. Bollinger's email does not "on its face" say anything "about taking steps to avoid ABS review, much less falsifying figures."[18] The letter need not explicitly state that; indeed, the complaint alleged that the letter "indicated" it. The district court did not view the letter, including its potential implications, in the light most favorable to the United States.

Second, concerning Mr. Bollinger's concern that Bollinger might "BLOW the program" if ABS reviewed the converted vessel at the Coast Guard's request, the court found, "His email *reads most naturally* as expressing a desire that Bollinger be involved in any ABS review, to answer questions and provide information or insights that could help ABS evaluate the design."[19] The district court found the United States' allegations concerning the 2002 email exchange "simply not reasonable."[20] With respect to the three false calculations noted above, the district court declined to draw the reasonable inference urged by the United States: "The United States argues simply that three incorrect calculations suggest an effort to fabricate. This is unpersuasive. . . . Further, the allegation that one of the incorrect values in the reported calculation was 16,000 times greater than the correct input is of little significance without knowing the context and nature of these inputs."[21]

---

[18] 979 F. Supp. 2d at 732.
[19] *Id.* (emphasis added).
[20] *Id.* at 733.
[21] *Id.* at 731.

12

No. 13-31301

We conclude the district court erred by improperly weighing the evidence, by focusing on facts the United States did not plead rather than the inferences that the pleaded facts supported, and by viewing the facts in the light most favorable to Bollinger. Rule 12(b)(6) does not require the United States to present its best case or even a particularly *good* case, only to state a plausible case. The First Amended Complaint satisfies that minimum standard and sets out facts sufficient to support a claim under the FCA. Whether or not the United States may prevail on its claim in later stages of this proceeding, it has at least stated enough to survive this facial challenge.

Based on the facts set out in the complaint, one may reasonably infer that Bollinger acted "in reckless disregard of the truth or falsity" of the measurements.[22] A key factor is Bollinger declining outside review of a critical calculation while expressing concern that such review might reveal problems in hull strength—the exact problem with the section modulus calculation that ultimately caused the boats to be decommissioned. Relatedly, Bollinger falsely certified that the boats had been reviewed for unrestricted service by a representative of an independent agency, when Bollinger had not had any independent agency review them. Similarly, one could reasonably infer that Bollinger acted, at a minimum, recklessly in regard to the truth or falsity of the section modulus number because it calculated three different incorrect values (one of which included a value overinflated by 16,000 times) and submitted only the highest one to the United States. Viewed in the light most favorable to the United States, these facts state a claim under the FCA.

---

[22] 31 U.S.C. § 3729(b)(1)(A)(iii).

### E.  The District Court Applied the Government Knowledge Defense Prematurely.

Because we conclude the United States has sufficiently pleaded knowledge, we must address whether some of the United States' claims are subject to dismissal under the "government knowledge defense" because the Coast Guard continued to make payments and accept delivery of the ships after it was aware of the incorrect section modulus calculation. "The inaptly-named 'government knowledge defense'" is the principle "that under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly,' because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway."[23] "This defense is inaptly named because it is not a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim."[24] Under this principle, "[w]here the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises."[25]

The question is whether the government knowledge defense may be applied at the motion to dismiss stage. Research discloses only one district court case where it has been applied at this stage rather than at the summary judgment or trial stage.[26] All circuit court authorities suggest that the defense

---

[23] *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Jones, J., specially concurring) (citation and internal quotation marks omitted).

[24] *Id.* at 682 n.8 (Jones, J., specially concurring).

[25] *Id.* at 682 (Jones, J., specially concurring) (citations omitted).

[26] *See United States ex rel. Marquis v. Northrop Grumman Corp.*, No. 09-C-7704, 2013 WL 951095 (N.D. Ill. Mar. 12, 2013). Even though the district court in *Marquis* granted the motion to dismiss based in part on the government knowledge defense, it noted that the underlying facts might not actually support the defense:

Case: 13-31301     Document: 00512937794     Page: 15     Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 16 of 18

No. 13-31301

should not be applied at this stage because it serves simply as a factor weighing against the defendant's knowledge, as opposed to a complete negation of the knowledge element.[27]

We agree with our sister circuits. The government knowledge defense is not appropriate at the motion to dismiss stage, which requires us to draw all

---

> Based upon such facts, Marquis has alleged that the Government paid Northrop under the Contract after acquiring knowledge of and investigating the purported Contract violations. Thus, Marquis has failed to state a valid FCA claim. *The court notes that the facts alleged in the complaint leave open the possibility that a claim or claims may have been presented for payment before the Government received notice of the purported Contract violations.* However, the complaint does not sufficiently allege that such was the case, which leads the court to the second deficiency in the complaint, Marquis' failure to plead with the particularity required of Federal Rule of Civil Procedure Rule 9(b) (Rule 9(b)).

2013 WL 951095 at *2 (emphasis added). Even if it is proper to address the government knowledge defense at the motion to dismiss stage, the district court's conclusion in *Marquis* seems suspect, given Rule 12(b)(6)'s requirement that a court construe the facts in the light most favorable to the plaintiff.

[27] In *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416 (9th Cir. 1991), the Ninth Circuit reasoned:

> [T]he knowledge possessed by officials of the United States may be highly relevant. Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth. But this comforting conclusion for the Water Agency cannot be reached by mere inspection of Hagood's complaint. Only at the stage of trial or summary judgment will it be possible for a court to say, for example, that the Water Agency did merely what the Corps bid it do, that the Water Agency had no knowledge that its contract was based on what Hagood has alleged was false information.

*Id.* at 1421; *see also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008) ("[The government knowledge defense] is only an inference. It does not *automatically* preclude a finding of scienter." (citation omitted)); *Southland*, 326 F.3d at 682 n.8 (Jones, J., specially concurring) (describing the defense as "a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim"); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir. 1993) ("[W]e agree with *Hagood* that the statutory basis for an FCA claim is the defendant's knowledge of the falsity of its claim, which is not automatically exonerated by any overlapping knowledge by government officials." (citation omitted)).

Case: 13-31301     Document: 00512937794     Page: 16     Date Filed: 02/16/2015
Case 2:12-cv-00920-SSV-MBN   Document 176   Filed 02/23/15   Page 17 of 18

No. 13-31301

inferences in favor of the United States. It is more proper at the summary judgment or trial stage as "a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim."[28]

## IV. CONCLUSION

Because we conclude that the complaint alleges sufficient facts to state a claim, we REVERSE and REMAND for further proceedings consistent with this opinion.[29]

---

[28] *Southland*, 326 F.3d at 682 n.8 (Jones, J., specially concurring).

[29] On appeal, Bollinger asserted four alternative grounds for dismissal which we decline to adopt, including its contention that the First Amended Complaint should be dismissed because it refers only generally to "Bollinger" and fails to allege with particularity the specific acts taken by each of the three defendants. The United States argues that its ability to plead the acts of each defendant with greater particularity depends on discovery of facts within Bollinger's control, and Bollinger has not provided that information in discovery. The district court has not yet addressed this issue, but in the event the district court finds some merit in Bollinger's argument on remand, it may consider less drastic alternatives to dismissal, including leave to amend, perhaps after additional discovery. *See* FED. R. CIV. P. 15(a)(2); *Grubbs*, 565 F.3d at 192 & n.36.

# United States Court of Appeals
**FIFTH CIRCUIT**
OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

February 16, 2015

Mr. William W. Blevins
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

    No. 13-31301   USA v. Bollinger Shipyards, Inc., et al
                    USDC No. 2:12-CV-920

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Dawn D. Victoriano, Deputy Clerk
                        504-310-7717

cc:
    Mr. Arnold M. Auerhan
    Mr. C. Berwick Duval II
    Mr. Stanwood Robert Duval
    Mr. Andrew Gerald McBride
    Mr. Scott Michael McCaleb
    Mr. Marcus Bedford Slater Jr.
    Ms. Sharon Denise Smith
    Mr. Mark Bradley Sweet
    Mr. Roderick L. Thomas
    Ms. Abby Christine Wright
    Ms. Jennifer Jean Zeien